Docket No. 89553–Agenda 6–September 2002.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RAUL CEJA, Appellant.

Opinion filed April 17, 2003.

JUSTICE FREEMAN delivered the opinion of the court:

Following a jury trial in the circuit court of Du Page County, defendant, Raul Ceja, was convicted of the first degree murder of Alfredo Garcia and Richard Sanchez (see 720 ILCS 5/9–1(a) (West 1998)) and of the unlawful possession of a stolen or converted motor vehicle (see 625 ILCS 5/4–103(a)(1) (West 1998)). At a separate sentencing hearing, the court, sitting without a jury, found defendant eligible for the death penalty and further determined that there were no mitigating circumstances sufficient to preclude imposition of that sentence.

Accordingly, the court sentenced defendant to death on the murder convictions and to a seven-year prison term on the stolen-vehicle conviction. The death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a).

Defendant raises issues pertaining both to the guilt phase of the trial and to the aggravation and mitigation phase of the death sentencing hearing. Subsequent to the filing of defendant’s appeal, former Governor George Ryan commuted defendant’s death sentence to natural life imprisonment without possibility of parole or mandatory supervised release.

An appellate issue is moot when it is abstract or presents no controversy. 
People v. Blaylock
, 202 Ill. 2d 319, 325 (2002). An issue can become moot if circumstances change during the pendency of an appeal that prevent the reviewing court from being able to render effectual relief. 
People v. Jackson
, 199 Ill. 2d 286, 294 (2002). Commutation removes a judicially imposed sentence and replaces it with a lesser, executively imposed sentence. 
People ex rel. Johnson v. Murphy
, 257 Ill. 564, 566 (1913); see Black’s Law Dictionary 274 (7th ed. 1999).

Therefore, the commutation rendered defendant’s sentencing issues moot. See, 
e.g.
, 
Lewis v. Commonwealth
, 218 Va. 31, 38, 235 S.E.2d 320, 325 (1977); 
State v. Mitchell
, 239 Or. 87, 88, 396 P.2d 572, 573 (1964).
(footnote: 1) We exercise our discretion to retain jurisdiction of the nonsentencing issues in this case. See, 
e.g.
, 
McGill v. Illinois Power Co.
, 18 Ill. 2d 242, 244 (1959). Addressing only the viable, nonsentencing issues, we now affirm defendant’s convictions.

BACKGROUND

Defendant and Rene Soto were separately charged with possession of a stolen motor vehicle and first degree murder. The charges arose, respectively, from the July 24, 1998, theft of a Chevrolet Tahoe, a sports utility vehicle, from an automobile dealership, and the July 26, 1998, fatal shooting of Garcia and Sanchez by the occupants of that stolen vehicle. Soto was tried separately.

The State’s theory of the case, as explained in its opening statement, was that defendant, Soto, and a third unknown individual were members of the Maywood Latin Kings street gang. They killed the victims, who were suspected members of the rival Franklin Park Imperial Gangsters street gang, in an act of gang retaliation. Although the evidence did not establish which particular shooter killed which particular victim, defendant was criminally accountable for the murders.

The State’s case was essentially as follows. On Friday, July 24, 1998, Elizabeth Camacho was a salesperson at Team Chevrolet at 720 Kingery Highway in Westmont. The dealership building had glass walls. From inside the dealership one could see the inventory parked outside.

As Camacho drove into the dealership’s parking lot at approximately 9:30 a.m., she saw two Hispanic males looking at a new, dark-red Chevrolet Tahoe. Camacho believed that the two men were either porters, 
i.e.
, dealership employees, or a porter with a customer who was waiting for a salesperson. Camacho entered the building. Camacho then saw other porters outside the building. She walked outside and asked them who the two men were. They responded that the two men did not work at the dealership.

Camacho reentered the dealership building and stepped onto a high podium located in the middle of the sales floor. The podium afforded a general view of the inventory parked outside and, specifically, an unobstructed view of the Chevrolet Tahoe parked in front of the dealership. The podium was approximately 30 to 60 feet away from the Tahoe.

On the podium, Camacho saw the two men enter the Tahoe and drive it away at high speed. The men did not have permission to take the Tahoe from the dealership. Camacho subsequently identified defendant as the man who drove the Tahoe from the dealership.

Melrose Park police officer Patrick Scavone testified that he responded to a report of gunshots at defendant’s home on July 24, 1998, at 11:05 p.m. Scavone spoke with defendant’s mother, who was upset. Scavone saw a bullet hole in the front of the house. The bullet had pierced the wall and had lodged in a chair. He did not attempt to recover the bullet because he did not want to destroy the chair. There were several persons in the house at the time of the shooting, including a small child, but defendant was not present.

Another State’s witness, Refugio Reyna, was a member of defendant’s gang. Reyna recounted that in the early morning of July 25, Soto approached him and asked for a Smith & Wesson. After they spoke, Soto walked toward where the guns were kept.

On Sunday, July 26, 1998, at approximately 9:30 p.m., Kevin Oldaker, Stephanie Alfano, and their eight-month-old son were driving in the west-bound lanes on Grand Avenue in Elmhurst. They halted at a red traffic light at the intersection of Grand and Oak Lawn Avenues.

A red Lincoln with two men inside pulled up to the intersection on Oldaker’s left side. When the traffic light turned green, a Chevrolet Tahoe sped up in the left-turn lane, to the left of the Lincoln. The maroon Tahoe had three occupants: the driver, a front seat passenger and a back seat passenger. The passengers began shooting at the occupants of the Lincoln. Approximately nine shots were fired.

To avoid crossfire, Oldaker drove about 20 feet forward into the intersection and stopped. The Tahoe made a fast U-turn into the east-bound side of Grand Avenue and stopped alongside the Lincoln. The driver of the Tahoe shot at the Lincoln approximately five times, and then sped east on Grand Avenue. The Lincoln made a U-turn and tried to follow the Tahoe. However, a short distance from the intersection, the Lincoln veered off the street and crashed into a sign.

Oldaker also made a U-turn and followed the Tahoe and the Lincoln. He intended to chase the Tahoe, but stopped to aid the occupants of the crashed Lincoln.

Both Oldaker and Alfano described the driver of the Tahoe and the Tahoe’s front passenger as being two Hispanic males wearing hooded sweatshirts, with the driver being heavyset. Oldaker and Alfano did not see the face of the back seat passenger. Neither Oldaker nor Alfano identified defendant as being in the Tahoe.

That evening, Elmhurst police officer Kenneth Lafin was in his patrol car when he heard a radio dispatch regarding the shooting. The dispatch described a dark-red, Suburban-type vehicle traveling east on Grand Avenue. Lafin proceeded to Interstate 290. As Lafin entered the highway, he observed, several car lengths ahead, a dark-colored Chevrolet Tahoe also entering the highway. Lafin followed the Tahoe. At one point Lafin maneuvered to the right side of the Tahoe. He observed that the Tahoe’s right-rear passenger window was either rolled down or broken out. He saw two persons sitting in front and one person sitting in the rear. The only face Lafin observed was that of the driver, whom Lafin described as a heavyset Hispanic male.

Lafin followed the Tahoe as it exited the highway and proceeded north on Mannheim Road. The Tahoe accelerated. After the Tahoe sped through a restaurant parking lot, Lafin activated his emergency siren and lights. A high-speed chase ensued on narrow residential streets, with Lafin in pursuit one or two car lengths behind the Tahoe.

The Tahoe turned into an alley and stopped. Lafin saw two persons exit the vehicle; one from the driver’s side, who ran east, and one from the passenger side, who ran west. Lafin continued driving in an unsuccessful attempt to intercept the person who ran east. Lafin was eventually directed to return to the abandoned Tahoe and secure it for evidence. Its engine was still running and glass was in the rear seat of the vehicle. He remained there until other police officers arrived to process the vehicle.

That evening, Michael Heiberger was hosting a party at his home at 614 Marshall Avenue in Bellwood. Heiberger was sitting with visitors in his backyard, facing the alley. His backyard had a view of his carport and of the alley. Among those with Heiberger was Richard Deveris and his family.

At approximately 9:35 p.m., Heiberger heard an emergency siren and squealing tires. A Chevrolet Tahoe sped down the alley and came to an abrupt halt at his property. Three individuals fled the Tahoe and ran in different directions. The driver, a heavyset man, ran through the carport and towards the gate of Heiberger’s backyard fence. Heiberger, joined by his guests, approached the gate and shouted at the driver, “Don’t even think about it.” The driver then turned and ran down the alley. Heiberger could not identify defendant as one of the persons who fled from the vehicle.

Police from several nearby communities established a perimeter around the area. At approximately 9:45 p.m., a police dog barked at a large bush near a house at 620 Frederick Street in Bellwood, two blocks from where the Tahoe had been abandoned. Police officers shone their flashlights into the bush and saw defendant crouched therein. With defendant inside the bush was Rene Soto, whom officers described as a heavyset Hispanic male. Both defendant and Soto were sweating and breathing heavily.

Franklin Park police officer Michael Jones was one of the law enforcement officials at the scene of defendant’s arrest. Jones knew that a shooting had occurred. He patted defendant for weapons following his arrest, but found none. Jones took defendant aside, away from Soto, and asked him a series of questions. Jones asked defendant how many guns were involved in the shooting, and defendant responded “one.” Jones asked defendant where the gun was; defendant replied that he did not know. Jones asked defendant who had the gun; defendant responded that he did not know. Jones asked defendant to describe the gun; defendant repeated that he did not know. Jones then exhorted defendant to reveal the location of the gun, because a child might find it and get hurt. Defendant responded that the gun was in a backyard.

Defendant was placed in the squad car of Elmhurst police officer James Pokyfke, who immediately read defendant his 
Miranda
 warnings. Pokyfke drove defendant to the police station. En route, defendant initiated a conversation with Pokyfke. Defendant stated, “Well, I guess it’s going to be a long couple of years.” Defendant then asked Pokyfke “if the people were all right.” Pokyfke responded that he did not know and that he was there only to transport defendant to the police station. Defendant then asked Pokyfke if he was a traffic officer and Pokyfke answered that he was. Defendant replied, “Well, maybe you will be a detective by the time I get out.”

The vehicle identification number of the abandoned Chevrolet Tahoe matched that of the vehicle stolen from the automobile dealership. Police recovered several items from the Tahoe. A plastic surgical glove was found in the glove compartment. An empty box of Speer nine-millimeter bullets and a pair of black gloves were found under the driver’s seat. A spent cartridge was found on the rear floor and another in the rear cargo area. The right-rear passenger window was broken; shards of glass were inside and outside the vehicle.

In a yard near the abandoned Tahoe, police found a navy-blue hooded sweatshirt. Police found nearby a Smith & Wesson 9-millimeter handgun wedged in the branches of a bush. The gun had one live round in the chamber and four remaining in the magazine. Next door to the house where defendant and Soto were arrested, police found a grey hooded sweatshirt. Police subsequently recovered a Ruger 9-millimeter handgun from under a bush at a nearby house.

The victims suffered fatal gunshot wounds to the back. According to the testimony of the medical examiner, their wounds were consistent with their leaning forward and twisting to the right, exposing their backs.

Ballistics analysis revealed the following. One of the spent cartridges found inside the Tahoe had been fired from the Ruger and the other spent cartridge found in the Tahoe had been fired from the Smith & Wesson. Also, testing established that the two handguns fired the bullets that were recovered from the Lincoln. The Smith & Wesson fired the single bullet recovered from the body of Garcia and also fired the single bullet recovered from the body of Sanchez.

Fingerprint evidence revealed the following. Soto’s left thumbprint was found on the empty box of bullets. Also, Soto’s handprints were found at various locations on the exterior of the Tahoe. Defendant’s handprints were not found on the exterior or interior of the Tahoe, or on any object inside the vehicle. However, a partial palm print found on the magazine inside the Ruger handgun matched defendant’s left palm.

Alfred Luckas, was a forensic scientist employed by the Du Page County sheriff’s crime laboratory. He received a sample of tempered glass fragments from the broken window of the stolen Tahoe and a sample of tempered glass fragments recovered from the intersection of Grand and Oak Lawn Avenues. His analysis could not distinguish between the two samples. He determined that there was an “association” between the samples, meaning that they could have originated from the same source. Further, after referring to an Illinois State Police Crime Laboratory database of glass samples, Luckas opined that there was a “good probability of common origin” between the glass from the Tahoe window and the glass found at the intersection of Grand and Oak Lawn Avenues.

Luckas also removed glass fragments from the shoes of defendant and Soto. Based on his analysis, Luckas concluded that the glass taken from those shoes and the glass from the Tahoe window “could have originated from the same source.” Referring again to the Illinois State Police Crime Laboratory database, Luckas opined that there was a “good probability of common origin” between the glass from the Tahoe and the glass from the shoes of defendant and Soto.

Also, witnesses testified regarding a gang-related motive for the crimes. Defendant and Soto were members of the Maywood Latin Kings. Defendant knew that one of the victims, Sanchez, was a member of the Franklin Park Imperial Gangsters, a rival gang, and that Sanchez’s gang nickname was “Boxer.” The Imperial Gangsters were headquartered in an area of Franklin Park known as “the Jungle.” The two handguns that police recovered in the area of defendant’s arrest belonged to defendant’s gang. Every gang member knew where those guns were hidden. It would not have been unusual for defendant to have handled one or both of them.

The State also introduced evidence of statements made by defendant and Soto in the detention area of the Elmhurst police station. Elmhurst police detective Raymond Bradford, Bensenville police officer Gonzalez Gomez, and Du Page County Assistant State’s Attorney Jeffrey Kendall testified as to the statements they heard through an intercom system. The intercom allowed a person in the front desk area of the station to hear and speak with a person in any of the cells in the detention area.

After their arrest on the night of July 26, 1998, defendant and Soto were placed in separate cells. On July 28, at approximately 9:30 p.m., Kendall heard defendant say to Soto, “They got the guns.” The three listeners heard Soto say, “Yea, two, they showed me one,” or “They have got two, they showed me one.” Defendant then said, in Spanish, “Hey, they can hear what we are saying.” Soto then said, in English, “Hey, we are innocent.” Then they both laughed.

At approximately 9:45 p.m., Gomez heard one person say, “That guy shot up our town.” Another person responded, in Spanish, “We found them.” Gomez then heard laughter.

During that time, Bradford heard defendant say, “My parents are sending my brother away.” Soto responded, “Oh, yeah.” Defendant then said, “They think that they will come after him. I hope the brothers don’t get popped. They don’t have guns anymore.” Soto again responded, “Yeah.” Defendant then said, “The fat one,” and he laughed. Defendant continued, “He was my sister’s boyfriend, Boxer.” According to Bradford, defendant said that Boxer “is from the jungle or lives in the jungle. He wasn’t even banging.” Then defendant and Soto laughed.

Kendall’s testimony as to defendant’s statements resembled that of Gomez and Bradford. In addition to the above-mentioned statements, Kendall heard defendant say, “The police have my shoes. I want them back, but there is something with the glass in the car.”

The defense called Elmhurst police service officer Jodi Bellis; Griselda Ceja, defendant’s mother; Dr. Ross Firestone, an expert in ceramics and glass; and Robert Hostick, a fingerprint examiner. The defense case, as reflected in its closing argument, was essentially to identify deficiencies in the State’s case.

The defense pointed to discrepancies in Camacho’s identification of defendant as the person who drove the Tahoe from the dealership. The defense stressed to the jury that no one identified defendant as being in the Tahoe at the time of the shooting, and that defendant’s handprints were not found on the Tahoe or on any object therein. The defense also reminded the jury that, although defendant handled a magazine of one of the handguns, there was no evidence that he handled that gun on the night of the shooting.

Also, the defense attacked Luckas’ expert opinion that there was a “good probability” that the glass from the soles of defendant’s shoes came from the broken window of the Tahoe. The defense posited that such a conclusion is nonscientific and built on a false premise.

The defense also questioned the reliability of the testimony of Bradford, Gomez, and Kendall regarding the overheard statements of defendant and Soto in jail. The defense offered noninculpatory interpretations of defendant’s statements.

At the close of the evidence, the trial court refused defendant’s tendered jury instruction regarding conspiracy to commit first degree murder as an included offense of first degree murder based on accountability. The jury returned general verdicts of guilty of the first degree murders of Garcia and Sanchez. The jury also returned verdicts finding defendant guilty of unlawful possession of a stolen or converted motor vehicle.

Defendant waived a sentencing jury. At the first stage of the death sentencing hearing, the parties stipulated that the trial court could consider all of the evidence presented at trial. The court found beyond a reasonable doubt the presence of three statutory aggravating factors: defendant had been convicted of murdering two or more individuals; the murder was committed in a cold, calculated, and premeditated manner, pursuant to a preconceived plan, scheme, or design to take a human life by unlawful means, and the conduct of defendant created a reasonable expectation that a death of a human being would result therefrom; and the murder was committed as a result of the intentional discharge of a firearm by the defendant from a motor vehicle and the victim was not present within the motor vehicle. See 720 ILCS 5/9–1(b)(3), (b)(11), (b)(15) (West 1998). Thus, the trial court found that defendant was eligible for the death penalty.

At the second stage of the death sentencing hearing, after considering evidence in aggravation and mitigation, including the evidence heard at the previous phases of the trial, the court found that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. The trial court accordingly sentenced defendant to death on the first degree murder convictions. The court also sentenced defendant to a seven-year prison term on the stolen vehicle conviction.

Defendant appeals. Additional pertinent facts will be discussed in the context of the issues raised on appeal.

ANALYSIS

I. Suppression of Statements: Eavesdropping

Prior to trial, defendant filed a motion 
in limine
 to bar the admission of the conversation between defendant and Soto overheard in the detention area of the Elmhurst police station. Defendant claimed that law enforcement officials obtained the statements in violation of, 
inter alia
, the eavesdropping statute contained in the Criminal Code of 1961 (720 ILCS 5/14–1 through 14–9 (West 1998)). Defendant assigns error to the trial court’s denial of his motion and asks us for a new trial.

We note that defendant does not claim a violation of any constitutional right. Rather, he claims that his conversation with Soto was overheard in violation of, and therefore precluded by, the eavesdropping provisions of the Criminal Code. Section 14–2 of the Criminal Code provides that a person commits eavesdropping when that person: “(a) Uses an eavesdropping device to hear or record all or any part of any conversation unless he does so (1) with the consent of all of the parties to such conversation.” 720 ILCS 5/14–2(a)(1) (West 1998). Further, any evidence obtained in violation of the eavesdropping statute is inadmissible. 720 ILCS 5/14–5 (West 1998).

Defendant assigns error to the trial court’s conclusion that he impliedly consented to the monitoring of his conversation with Soto. Defendant argues that he was not given sufficient notice of the monitoring so as to establish consent.

We first address defendant’s argument that we should review this contention 
de novo
. At a hearing on a motion to suppress, it is the function of the trial court to determine the credibility of the witnesses, the weight to be given to their testimony, and the inferences to be drawn from the evidence. 
People v. Galvin
, 127 Ill. 2d 153, 163 (1989). Accordingly, the trial court’s ruling on a motion to suppress generally will not be overturned unless it is manifestly erroneous. 
Galvin
, 127 Ill. 2d at 162; 
People v. Evans
, 125 Ill. 2d 50, 78 (1988). “Manifestly erroneous means arbitrary, unreasonable and not based on the evidence.” 
People v. Wells
, 182 Ill. 2d 471, 481 (1998). However, 
de novo
 review is appropriate when neither the facts nor the credibility of witnesses is questioned. 
People v. Williams
, 181 Ill. 2d 297, 309 (1998).

Defendant argues that we should review this contention 
de novo
 because he does not now challenge any of the facts found by the trial court. We disagree. The only pure legal question involved in this issue is whether the doctrine of implied consent applies to the Illinois eavesdropping statute. If this were the sole issue presented, our review of this question would be 
de novo
, and our answer would be “yes.” See 
People v. Ardella
, 49 Ill. 2d 517, 522 (1971). However, this is not defendant’s argument. Defendant argues that he did not impliedly consent. This is a factual question, which turns on the credibility of witnesses. We must defer to the trial court, which was able to observe witnesses and draw inferences and conclusions of what defendant knew and, thus, whether he impliedly consented. Therefore, we will reverse the trial court on this issue only if its conclusion is manifestly erroneous. See 
Williams
, 181 Ill. 2d at 309; 
United States v. Van Poyck
, 77 F.3d 285, 292 n.11 (9th Cir. 1996) (noting that question of implied consent turned on credibility of witnesses, and trial court’s determination thereof given deference on review).

Testimony at the suppression hearing showed the following facts. Defendant and Soto were in the detention area of the Elmhurst police station. Each was held in a separate cell at opposite ends of the detention area, approximately 35 feet apart. The cells are constructed of cinder blocks. Each cell has a steel door with a plexiglass window; each window has a small perforated area for communication. The police station has a two-way speaker system through which a person sitting in the front desk reception area can monitor each cell in the detention area. A speaker is clearly visible in each cell. Whenever the monitoring system in a particular cell is switched on, a loud pinging tone comes from the speaker in that cell every 9 to 10 seconds to notify the person in that cell that he or she is being monitored. A person in the front desk reception area of the jail can speak into a particular cell by pushing a button when the monitoring system is on in that cell. The front desk is approximately 35 feet from one door to the cell area and approximately 55 feet from the other door to the cell area. Consequently, it is not possible to hear any conversation in the cell from the reception area without the use of the monitoring system.
(footnote: 2)
 On July 28, 1998, service officer Jodi Bellis worked at the front desk of the Elmhurst police station from 7 a.m. to 3 p.m. When she entered the desk area that morning, the monitoring device was operating and pinging, and Bellis heard a conversation in Spanish in the detention area. The conversation continued through her shift. Defendant and Soto were the only persons in custody in the detention area.

At various times throughout that morning, Bellis advised defendant and Soto to be quiet. She told them to be quiet through the monitoring system. They paused, then continued speaking.

Also, every 30 minutes, Bellis was required to go to the detention area and check on those in custody. During several of those checks that morning, Bellis told defendant and Soto to be quiet. During one such visit, according to Bellis, she explained to defendant and Soto that they “had to be quiet even when I am not in the room, because I can monitor the conversation at the front desk.” Defendant responded by flashing gang signs and continuing to talk loudly in Spanish.

Bradford, Gomez, and Kendall then testified, as recited earlier, that defendant said, in Spanish, “Hey, they can hear what we are saying.” Soto then said, in English, “Hey, we are innocent.” Then they both laughed.

Based on the evidence presented, the trial court found that defendant and Soto were aware that their statements were being monitored. According to the trial court, they acquiesced in and impliedly consented to that monitoring when they continued to talk loudly to each other despite their knowledge that they were being monitored.

The controlling principles are widely recognized. The element of consent under the eavesdropping statute “may be satisfied without a showing of the type of informed consent necessary for a defendant to waive a fourth amendment right.” 
People v. Fredrics
, 76 Ill. App. 3d 1043, 1049 (1979); accord 34 Ill. L. & Prac. 
Telecommunications
 §39, at 391 (2001).

Consent in this context may be either express or implied. 
United States v. Workman
, 80 F.3d 688, 693 (2d Cir. 1996). Consent exists where a person’s behavior manifests acquiescence or a comparable voluntary diminution of his or her otherwise protected rights. 
Griggs-Ryan v. Smith
, 904 F.2d 112, 116 (1st Cir. 1990). Implied consent is consent in fact, which is inferred from the surrounding circumstances indicating that the party knowingly agreed to the surveillance. Thus, implied consent may be deduced from the prevailing circumstances in a given situation. The circumstances relevant to an implication of consent will vary from case to case, but will ordinarily include language or acts that tend to prove that a party knows of, or assents to, encroachments on the routine expectation that conversations are private. 
Griggs-Ryan
, 904 F.2d at 117.

In this case, the record shows that speakers were visible in each cell. The monitoring system emitted a clearly audible pinging sound when, and only when, it was activated in a particular cell.

Further, Bellis repeatedly told defendant and Soto to be quiet. Bellis warned them not only in person, but also through the monitoring system itself. These intercom warnings reasonably notified defendant and Soto that their conversation was being monitored. Indeed, in giving a face-to-face warning, Bellis told defendant and Soto that she could monitor their conversation from the front desk of the police station. Defendant himself admitted, “Hey, they can hear what we are saying.” In our view, this establishes conclusively that defendant was aware of the situation and, nevertheless, knowingly engaged in conversation.

Although not controlling, we note that federal courts have similarly applied the principle of implied consent in the context of title III of the Omnibus Crime Control and Safe Streets Act (18 U.S.C. §2511(2)(c) (2000)). For example, in 
Workman
, 80 F.3d at 693, the United States Court of Appeals for the Second Circuit held that implied consent existed to record a state prison inmate’s telephone conversations for use in criminal prosecutions, even though the inmate was never told that use of the telephone system constituted consent to be recorded, where the inmate received repeated notice that telephone calls were subject to surveillance, and the evidence indicated that he was in fact aware of the monitoring system but nevertheless used the telephone.

Based on all the evidence, we cannot say that the trial court manifestly erred in concluding that defendant was aware that his statements were electronically monitored and, by continuing to loudly talk to Soto, acquiesced therein. “Such acquiescence constitutes consent for the purpose of the eavesdropping statute.” 
Ardella
, 49 Ill. 2d at 522; accord 
In re Conservatorship of the Estate of Stevenson
, 44 Ill. 2d 525, 532 (1970).

II. Glass-Comparison Evidence

Defendant next claims that the State’s use of glass-comparison evidence denied him a fair trial. He contends that: (A) Luckas’ expert opinion lacked a reasonable scientific basis, and (B) the State improperly argued the evidence to the jury. Defendant seeks a new trial.

A. 
Admissibility

Defendant challenges Luckas’ opinion that there was a “good probability” that the glass fragment from defendant’s shoe came from the broken window of the Tahoe. Luckas explained his analysis as follows.

Luckas analyzed four glass samples. One came from the broken window of the Tahoe; one came from the intersection of Grand and Oak Lawn Avenues. Luckas removed the other two samples from the shoes of defendant and Soto. Luckas compared the glass from defendant’s shoe with glass from the Tahoe. Because the sample from defendant’s shoe was so small–the size of a pinhead–Luckas was unable to make a visual comparison. Nor could he compare the two samples as to type, thickness, or density.

The only method of comparison available was the refractive index, which is a measure of how light passes through glass. To measure the refractive index of a piece of glass, it is ground up and placed on a microscopic slide. The slide is then placed inside an oven, which measures the refractive index of the glass at three different wavelengths of light. Using these measurements, an analyst can then compare the data from two glass samples to see if they are consistent. This means that the analyst can determine if the two samples either did not come from the same source, or they could have come from the same source. Regarding the samples from defendant’s shoe and the Tahoe, the refractive index indicated an “association.” In other words, the glass from the shoes of defendant and Soto “could have originated” from the Tahoe.

Luckas then explained that there existed a means “to try and get a handle on what value to place [on] that association. According to Luckas, the Illinois State Police Crime Laboratory compiled a database containing 2,087 glass samples “randomly collected through criminal investigations throughout the entire State of Illinois over approximately the past 20 years and we can compare that data to see how common, for instance, a glass sample is or how rare it is.” Luckas explained that a database finding falls in one of three ranges: “high probability of common origin,” “good probability of common origin,” or “common glass,” 
i.e.
, there exists only the bare association. Referring to the database, Luckas found that the glass from defendant’s shoe had a frequency of occurrence of 1 in 21 to 100, which was the middle range. Based on this finding, Luckas opined that there was a “good probability of common origin” between the glass from the Tahoe and the glass from the shoes of defendant and Soto.

Defendant presented his own expert, Dr. Ross Firestone, who challenged Luckas’ opinion that there was a “good probability” that the glass from defendant’s shoe came from the Tahoe. Firestone opined that there was “nothing scientific” about referring a refractive index to a database to determine a frequency of occurrence.

Before this court, defendant expressly does not challenge Luckas’ testimony regarding the refractive index of the glass fragments. Also, defendant does not challenge Luckas’ testimony regarding the “frequency of occurrence” of the refractive index of the glass from defendant’s shoe in the database. Rather, defendant contends that Luckas’ opinion, based on the database, that there was a “good probability” that the glass from defendant’s shoe came from the Tahoe “had no reasonably valid scientific basis, and should not have been allowed into evidence.”

The record shows that defendant neither objected to this testimony nor included the issue in his post-trial motion. Therefore, the issue is waived. 
People v. Turner
, 128 Ill. 2d 540, 555 (1989); 
People v. Enoch
, 122 Ill. 2d 176, 188 (1988).

However, defendant asks us to consider this issue under the plain error doctrine of Supreme Court Rule 615(a). Plain error is a limited and narrow exception to the general waiver rule, to be invoked only where the evidence is closely balanced or the alleged error is so substantial that it deprived the defendant of a fair trial. 
People v. Hampton
, 149 Ill. 2d 71, 100 (1992).

The plain error exception to the waiver rule does not save this issue. First, the evidence was not closely balanced. The State presented a strong circumstantial case against defendant.

The State’s evidence against defendant included the following. Defendant was positively identified as one of the two men who, two days before the killings, stole the Tahoe from which the fatal shots were fired. Defendant and Sanchez, who was one of the victims, belonged to rival street gangs. Defendant’s home was the target of a drive-by shooting on the day before the murders. Defendant’s gang kept the two handguns used in the murders on their turf so that gang members could have access to them. Shortly prior to the murders, Soto asked another gang member for the guns and then walked off in the direction of where the guns were hidden. Defendant’s palm print was on the magazine of one of those guns. Soto’s fingerprint was on an empty box of bullets in the Tahoe. Soto’s fingerprints were also found at several places on the outside of the Tahoe.

According to the eyewitnesses to the shooting, all three occupants of the Tahoe shot at the victims’ car. The driver and front passenger of the Tahoe were described as two Hispanic males wearing hooded sweatshirts. After the shooting, a police car chased the Tahoe, which pulled into an alley and all three occupants jumped out and ran. Less than 10 minutes later, defendant and Soto were found hiding together in a bush two blocks from where the Tahoe had been abandoned. They were sweating and nearly out of breath. Police found nearby two hooded sweatshirts and the two handguns which had been used in the murders. Defendant told a police officer that one gun had been used and that it had been discarded in a backyard. En route to the police station, defendant arguably reflected on the fact that he was likely to be in prison for a long time. He also asked “if the people were all right.”

In their police station conversation, defendant and Soto made several incriminating statements. Soto mocked, “Hey, we are innocent,” which caused them both to laugh. One of them said, “That guy shot up our town,” to which the other responded, “We found them.” This again prompted both to laugh. We note that defendant does not now contend that the evidence was insufficient to prove his guilt beyond a reasonable doubt. See 
People v. Jackson
, 84 Ill. 2d 350, 360 (1981). The evidence, therefore, was not closely balanced.

Further, this alleged error was not so substantial that it deprived defendant of a fair trial. “This second prong of the plain error exception is to be invoked only where the possible error is so serious that its consideration is ‘necessary to preserve the integrity and reputation of the judicial process.’ “ 
Hampton
, 149 Ill. 2d at 102, quoting 
People v. Herrett
, 137 Ill. 2d 195, 214 (1990). After reviewing the challenged testimony, we conclude that its allegedly erroneous admission is not of such a character.

Regardless of how skilled or experienced an expert may be, the expert may not state a judgment or opinion based on conjecture. However, “an expert opinion couched in terms of probabilities or possibilities based upon certain assumed facts is not improper or inadmissible.” 
Rodrian v. Seiber
, 194 Ill. App. 3d 504, 507 (1990); see 
People v. Columbo
, 118 Ill. App. 3d 882, 962-63 (1983); J. Corkery, Illinois Civil and Criminal Evidence §702.105, at 388 (2000) (“The expert need not give an opinion as to what actually did happen, but he or she can testify as to what probably did happen or what might or could have happened”).

Notwithstanding the above principle, defendant relies on 
People v. Bryant
, 113 Ill. 2d 497, 512-13 (1986), in which this court held that it had been improper for an expert to testify, as Luckas did here, that there was a “good probability” that two pieces of glass had a common source. This court stated, “There was no foundation presented for testimony regarding the frequency of the occurrence of this type of glass, much less a statement concerning the likelihood that the pieces had a common source.” 
Bryant
, 113 Ill. 2d at 513.

Bryant
, however, is distinguishable. In 
Bryant
, there was no foundation presented for that expert’s testimony regarding the frequency of occurrence, much less his ultimate opinion. Also, that defendant presented no evidence. 
Bryant
, 113 Ill. 2d at 501, 513.

In the present case, Luckas thoroughly explained the process by which he reached his ultimate opinion that there was a “good probability” that the glass from defendant’s shoe came from the Tahoe. Also, defendant presented his own expert to challenge Luckas’ opinion. Thus, “[t]he jury was fully aware of any ‘infirmities’ in the expert’s opinion, and it was for the jury to determine his credibility.” 
Rodrian
, 194 Ill. App. 3d at 507-08. We find no error; thus, there can be no plain error. 
People v. Keene
, 169 Ill. 2d 1, 17 (1995). Consequently, defendant’s procedural default of this issue is not excused.

B. 
Prosecutor’s Closing Argument

Defendant further contends that the prosecutor, in closing argument, overstated Luckas’ testimony. Defendant complains of the following three italicized statements:

“
What the glass does is it [sic] puts this defendant in the Tahoe where the broken glass is after the window is broken
, and we know the window is broken at Grand and Oak Lawn, right, because that’s where glass that also matches the Tahoe was found.

So the broken glass in the street matches the Tahoe. You know the Tahoe is at Grand and Oak Lawn, you know that’s where the window broke. 
And the glass in the defendant’s shoes puts him in the car right when the window breaks.
 *** [T]he glass is one piece of evidence. One piece to consider. But it fits in, 
and it describes the defendant as being in the car because the glass from the Tahoe was in his shoes.
” (Emphases added.)

Defendant contends that these remarks denied him a fair trial.

However, the record shows that defendant failed to object to these remarks at trial, and failed to raise the issue in his post-trial motion. The issue is, therefore, waived. 
Enoch
, 122 Ill. 2d at 186; 
Jackson
, 84 Ill. 2d at 358-59.

Defendant, however, asks us to review this issue under the plain error doctrine. As already discussed, the evidence here is not closely balanced. Thus, one of the two limited circumstances under which we apply the plain error doctrine is not present. Therefore, we consider only whether the second limited circumstance justifying application of the plain error doctrine is present, 
i.e.
, whether the alleged errors are of such magnitude that defendant was denied a fair trial, and remedying such errors is necessary to preserve the integrity of the judicial process. 
People v. Hall
, 194 Ill. 2d 305, 344 (2000); 
People v. Moore
, 171 Ill. 2d 74, 99 (1996).

In 
People v. Linscott
, 142 Ill. 2d 22 (1991), this court reversed a murder conviction based on prosecutorial comments that misrepresented two of three pieces of the State’s evidence against the defendant. In closing argument, the prosecutor commented that the defendant’s hair had been found at the crime scene. The 
Linscott
 court found that the prosecutor’s comment was improper because the evidence merely showed that the defendant was in a class of possible donors of the hair and not that the hair conclusively belonged to the defendant. 
Linscott
, 142 Ill. 2d at 28-34. Because the evidence in 
Linscott
 was closely balanced (
Linscott
, 142 Ill. 2d at 40), this court concluded that the improper comment amounted to plain error (
Linscott
, 142 Ill. 2d at 33-34).

As in 
Linscott
, we find that the prosecutor’s above-quoted comments in this case overstated the evidence. However, the prosecutor’s comments did not deprive defendant of a fair trial. Comments in closing argument must be considered in context of the entire closing argument of both the State and the defendant. 
People v. Cloutier
, 156 Ill. 2d 483, 507 (1993). The challenged remarks are only three brief statements contained in two paragraphs of the State’s entire closing argument, which, transcribed, consists of 32 record pages. Also, we note that the trial court instructed the jury to disregard statements made in closing argument not based on the evidence. See 
Moore
, 171 Ill. 2d at 100.

Considering the challenged comments in the context of the State’s entire closing argument, as we must (see 
Cloutier
, 156 Ill. 2d at 507), we hold that they did not prejudice defendant such as to deny defendant a fair trial or threaten deterioration of the judicial process. Accordingly, defendant’s procedural default of this issue is not excused.

Defendant alternatively asserts that he was denied the effective assistance of counsel when his trial counsel failed to preserve this issue for review. To demonstrate ineffective assistance of counsel, a defendant must show that: (1) the attorney’s performance fell below an objective standard of reasonableness, and (2) the attorney’s deficient performance prejudiced the defendant. Because the defendant must satisfy both prongs of this test, the failure to establish either is fatal to the claim. 
Strickland v. Washington
, 466 U.S. 668, 687-88, 697, 80 L. Ed. 2d 674, 693, 699, 104 S. Ct. 2052, 2064, 2069 (1984).

In this case, we can dispose of defendant’s assertion of ineffective assistance of counsel on the “prejudice” prong alone. We earlier concluded that Luckas’ testimony was not erroneous. Thus, the trial court would have rightfully overruled any defense objection thereto. Consequently, had defense counsel objected, the result would have been no different from the effect of his failure to object. This purportedly ineffective assistance of his trial counsel did not prejudice defendant. See, 
e.g.
, 
People v. Shaw
, 186 Ill. 2d 301, 330-32 (1998). Also, we earlier concluded that the prosecutor’s comments did not prejudice defendant such that he was denied a fair trial. Thus, defendant was not prejudiced in terms of 
Strickland
. See, 
e.g.
, 
Williams
, 181 Ill. 2d at 322-26.

III. Lesser-Included Offense

Defendant next claims that the trial court erred in refusing his tendered jury instruction regarding conspiracy to commit first degree murder as an included offense of first degree murder based on accountability. Defendant notes the following. A person is criminally accountable when he or she, 
inter alia
, agrees to aid another in the planning or commission of an offense. 720 ILCS 5/5–2(c) (West 1998). A person is guilty of conspiracy when he or she agrees with another to commit an offense and one of the conspirators performs an act in furtherance of that agreement. 720 ILCS 5/8–2(a) (West 1998). First degree murder based on accountability is potentially a capital offense (
People v. Ruiz
, 94 Ill. 2d 245, 260 (1982)), while conspiracy to commit first degree murder is not (720 ILCS 5/8–2(c) (West 1998)).

In this case, defendant contends:

“where the State relies on evidence of the defendant’s ‘agreement’ to aid in the planning or commission of the offense to establish guilt of murder-by-accountability, the defense should be able to rely on the same evidence to argue that the defendant merely ‘agreed’ that the offense should be committed by others, and is therefore guilty only of conspiracy to commit murder.”

The trial court ruled that conspiracy to commit first degree murder was not available as an included offense because the indictment did not contain any allegation that defendant agreed with another in the planning or commission of the murders.

We agree with the trial court. The controlling principles are quite settled. A defendant generally may not be convicted of an offense for which the defendant has not been charged. However, in an appropriate case, the defendant is entitled to have the jury instructed on less serious offenses that are included in the charged offense. Such a practice provides an important third option to a jury. If a jury believes that a defendant is guilty of something, but uncertain whether the charged offense has been proved, the jury might convict the defendant of the lesser offense rather than convict or acquit the defendant of the greater offense. See 
People v. Hamilton
, 179 Ill. 2d 319, 323-24 (1997); 
People v. Landwer
, 166 Ill. 2d 475, 485-86 (1995); 
People v. Novak
, 163 Ill. 2d 93, 105 (1994).

An included offense “[i]s established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense.” 720 ILCS 5/2–9(a) (West 1998). In applying this statutory definition, this court has repeatedly expressed its preference for the charging instrument approach to determine whether a particular offense is included in a charged offense. 
Hamilton
, 179 Ill. 2d at 324, 326-27; 
People v. Jones
, 175 Ill. 2d 126, 135 (1997).

The charging instrument approach is two tiered. First a court must determine whether the charging instrument describes the lesser offense. At a minimum, the instrument charging the greater offense must contain a broad foundation or main outline of the lesser offense. 
Jones
, 175 Ill. 2d at 135; 
Landwer
, 166 Ill. 2d at 486; 
Novak
, 163 Ill. 2d at 107.

“Second, if the charging instrument identifies a lesser-included offense, evidence adduced at trial must rationally support the conviction on the lesser-included offense.” 
People v. Baldwin
, 199 Ill. 2d 1, 6 (2002). A court must examine the evidence presented and determine whether the evidence would permit a jury to rationally find the defendant guilty of the lesser-included offense, but acquit the defendant of the greater offense. 
Hamilton
, 179 Ill. 2d at 324; 
Jones
, 175 Ill. 2d at 135; 
Landwer
, 166 Ill. 2d at 486.

“Whether the facts alleged in the charging instrument set forth a broad foundation or main outline of the lesser-included offense is a separate inquiry from whether the facts adduced at trial supported a conviction on the lesser-included charge.” 
Baldwin
, 199 Ill. 2d at 11. As this court in 
Baldwin
 explained:

“First, 
is
 the convicted offense indeed a lesser-included offense at all? To answer that question, we must examine the charging instrument and determine whether it sets forth a broad foundation or main outline of the lesser-included offense. Second, was it 
proper
 to find defendant guilty of this lesser-included offense? To answer that question, we must examine the evidence adduced at trial and determine whether it rationally supports a guilty finding. We cannot reach the second question without an affirmative answer to the first question.” (Emphases in original.) 
Baldwin
, 199 Ill. 2d at 14-15.

We must “cautiously avoid” eroding the charging instrument approach or converting it into something else. See 
Baldwin
, 199 Ill. 2d at 15.

In the present case, the indictment did not charge defendant with first degree murder as an accomplice and made no reference to a theory of accountability. Rather, the murder counts in the indictment charged defendant with first degree murder as a principal. This was not incorrect. It is proper to charge a defendant as a principal even though the proof is that the defendant was only an accomplice. 
People v. Nicholls
, 42 Ill. 2d 91, 100 (1969); 
People v. Nelson
, 33 Ill. 2d 48, 51-52 (1965). Courts permit this pleading practice because accountability is not a separate offense, but merely an alternative manner of proving a defendant guilty of the substantive offense. See 
People v. Doss
, 99 Ill. App. 3d 1026, 1029 (1981); 
People v. Williams
, 28 Ill. App. 3d 402, 404 (1975). A defendant charged as a principal can be convicted on a theory of accountability if supported by the evidence. 
People v. Carlson
, 224 Ill. App. 3d 1034, 1045 (1992); 
People v. Whitlock
, 174 Ill. App. 3d 749, 780-81 (1988); 
Doss
, 99 Ill. App. 3d at 1029.

In this case, although the State prosecuted defendant under a theory of accountability, the indictment charged him as a principal. Thus, the charging instrument did not contain any reference to an “agreement” that might describe the offense of conspiracy. This ends our inquiry. See 
Baldwin
, 199 Ill. 2d at 14-15; 
People v. Williams
, 315 Ill. App. 3d 22, 33 (2000) (stating that court need not discuss second prong of analysis if charging instrument does not describe a lesser-included offense).

Defendant concedes that “the State had the legal prerogative to proceed in that manner.” However, defendant asks us to expand the charging instrument approach to include jury instructions offered by the State. We decline defendant’s request. As jury instructions are based on the evidence presented at trial, this is simply another form of the evidence approach to determining lesser-included offenses, which this court rejected in favor of the charging instrument approach. See 
Novak
, 163 Ill. 2d at 107, 110.

Defendant complains that it is unfair to allow the prosecution to control the availability of lesser-included offense instructions through the language of the charging instrument. Rejecting such criticism, this court has explained that the State’s Attorney is vested with exclusive discretion in the initiation and management of a criminal prosecution. That discretion includes the choice of which charges shall be brought. A criminal defendant does not have the right to choose his or her prosecution or punishment. This court views the charging instrument approach as being consistent with these principles. 
Novak
, 163 Ill. 2d at 113 (and cases cited therein). We uphold the trial court’s refusal of defendant’s tendered jury instruction.

We have found no reversible error entitling defendant to a new trial. Accordingly, we uphold defendant’s convictions.

CONCLUSION

For the foregoing reasons, we have found no reversible error entitling defendant to a new trial. The commutation of defendant’s death sentence rendered his sentencing issues moot. Accordingly, the judgment of the circuit court of Du Page County is affirmed.

Affirmed
.

FOOTNOTES
1:     
1
We took with the case defendant’s motion to withdraw certain sentencing issues. We now deny that motion as moot.

2:     
2
We note that the record included live testimony and a videotape showing the detention area and recording the clearly audible pinging tone.