2023 IL App (2d) 230148-U
No. 2-23-0148
Order filed March 28, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 21-CF-612 |
| TERRANCE E. WILLIAMSON, | ) ) ) | Honorable Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Kennedy and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in declining to appoint new counsel to assist defendant with his claim that defense counsel was ineffective for proceeding to trial on sexual abuse charges before receiving the victim's medical records, which defendant asserts could have been used to impeach the victim's testimony. The medical records are not in the record on appeal, so defendant can only speculate as to their contents. Moreover, even if the records said what defendant asserts, there is no reasonable probability that the result of the trial would have been different if defendant had used the records to impeach.

¶ 2    Following a jury trial in the circuit court of Lake County, defendant, Terrance E. Williamson, was found guilty of four counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (2014)), one count of criminal sexual assault (720 ILCS 5/11-1.20(a)(3)

(West 2016)), and one count of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(d) (West 2014)). The victims were defendant's stepdaughters, J.L., J.B., and R.C. The trial court sentenced defendant to life imprisonment for each conviction of predatory criminal sexual assault of a child, a 15-year prison term for criminal sexual assault, and a 7-year prison term for aggravated criminal sexual abuse. The court ordered the sentences to be served consecutively. Defendant argues on appeal that the trial court erred by refusing to appoint new counsel to assist him with a posttrial claim of ineffective assistance of trial counsel. We affirm.

¶ 3                                I. BACKGROUND

¶ 4      Before trial, defendant subpoenaed certain medical records pertaining to J.B. At a pretrial hearing, the prosecutor mentioned the subpoena, explaining that "the information in the records *may* contain a denial of any sexual contact with anybody, which could be a defense; including the contact with the defendant." (Emphasis added.) At a subsequent hearing, the prosecutor told the court that "what the defense is hoping to achieve from the records is the victim was asked about sexual history during the meeting with the doctor and denied having any sexual contact, which would be a germane topic of cross examination or impeachment." On the date set for trial, the records had not yet been received. Nonetheless, both parties answered ready for trial. Defense counsel did not request that the trial be continued pending the availability of the subpoenaed records.

¶ 5      At trial, J.L. testified that she was born on February 6, 1999. In 2015, she resided with her father, and her siblings resided with her mother and defendant. In May or June 2015, J.L. spent the night at the apartment her mother and defendant shared with J.L.'s siblings. After getting ready for bed, she went to the kitchen to say goodnight to her mother. While walking to J.B.'s room, J.L.

passed defendant, who was in her mother's bedroom. Defendant asked her to sit on the bed. He put his hand up her shirt and touched her breast. She was not wearing a bra.

¶ 6    J.B. testified that she was born on August 20, 2002. When she first met defendant, she was living with her mother and her younger siblings, R.C., M.C., and B.K. When J.B. started sixth grade, she was 11 years old. On one occasion while in sixth grade, J.B. watched movies with her younger siblings and defendant in her mother's bedroom. After her younger siblings fell asleep, defendant put his hand in J.B.'s shorts and started touching her vagina. Eventually, he inserted his finger into her vagina. Then he pulled off her shorts and put his penis in her vagina. J.B. also recalled a subsequent incident while she was in sixth or seventh grade. On this occasion, which occurred one morning while her mother took J.B.'s younger siblings to daycare, defendant put his penis in her vagina. Usually, J.B.'s mother left the house at 5 a.m. and J.B. took the school bus at 7 a.m. J.B. also testified that defendant placed his penis in her vagina on several other occasions.

¶ 7    On July 3, 2015, J.B. was diagnosed with cancer. She testified to the circumstances surrounding the diagnosis. The family had planned a trip to an amusement park. Before they left, defendant commented that J.B. looked six months pregnant. J.B.'s mother agreed. She asked J.B. whether she was sexually active. J.B. said that she was not, but defendant said that J.B. was lying. J.B.'s mother asked her several more times if she was sexually active. J.B. persisted that she was not. J.B. acknowledged that this conversation occurred after defendant had sexually penetrated her. J.B. did not tell her mother what defendant had done, because she did not think her mother would believe her. J.B.'s mother took her to a doctor, who initially said that J.B. had a full-term baby. J.B. told the doctor that that was "impossible." Ultimately, J.B. was found to have a 32-centimeter abdominal tumor.

¶ 8    R.C. testified that she was born on February 21, 2006. Beginning when she was in first grade, she lived in an apartment in Waukegan with her mother, J.B., M.C., and B.K. Defendant moved in sometime later. R.C. lived in the apartment until the beginning of sixth grade, when she was about 11. R.C. described two incidents that occurred while she was living in the Waukegan apartment. The first incident involved defendant touching her vagina with either his finger or his penis. The second incident involved him placing his penis in her mouth. At some point, she told J.L. about these incidents.

¶ 9    J.L. testified that, in September 2020, she, J.B., and R.C. made accusations against defendant at a family meeting attended by J.L., J.B., R.C., their other siblings, several maternal aunts, and defendant. One of their aunts contacted the police. J.B. also testified about the meeting, but the only attendees she mentioned were her, her siblings, her mother, and defendant; she did not mention her aunts. She denied that, at the meeting, she accused defendant of engaging in sexual activity with her. R.C. testified that her aunts were at the family meeting along with her, her siblings, and her mother. At that meeting, she "didn't tell anybody the details" of the incidents she described in her testimony.

¶ 10    Francisco Cancino, a sergeant with the Waukegan Police Department, testified that, on September 16, 2020, he became involved in an investigation of defendant. Cancino arranged for R.C., M.C., and B.K. to be interviewed at the Lake County Children's Advocacy Center. Cancino arranged the interviews because of allegations involving R.C. M.C. and B.K. were interviewed because they might have seen or heard something relevant to the allegations involving R.C. Cancino also noted that B.K. was interviewed for the additional reason that she "would have been the age that the allegations would have started when [R.C.] was that age."

¶ 11    Anntoinette W., the mother of J.L., J.B., and R.C., testified for the defense that she married defendant in August 2014. They lived in a three-bedroom apartment with J.B., R.C., M.C., and B.K. Anntoinette testified that defendant routinely took the children to daycare. She further testified that it was during an argument about a missed driver's education class that J.B. first alleged that defendant had abused her. On cross-examination, Anntoinette testified that, before trial, she had reviewed the sign-in records for the daycare facility. She recalled seeing her signature on the records. Asked if she recalled seeing defendant's signature on the records, she replied that she did not think the daycare facility permitted defendant to sign her children in.

¶ 12    After the trial court was informed that the jury had reached a verdict, the court advised the parties that it had received J.B.'s subpoenaed medical records. The court indicated that it had reviewed the records *in camera* and that they did not "add anything to the case." The court tendered copies of the records to the parties, but they do not appear in the record on appeal.

¶ 13    Defense counsel filed a posttrial motion, stating that defendant was claiming, among other things, that counsel had failed to provide effective assistance. At the hearing on the motion, counsel confirmed that defendant wanted to raise a claim that counsel was ineffective. Counsel noted that he could not argue his own ineffectiveness. The trial court then asked defendant to explain his concerns about counsel's representation. Defendant noted, among other things, that counsel moved forward with trial without J.B.'s medical records. He claimed the medical records would have discredited her testimony. He explained that the records would have shown that

> "[J.B.], *** claimed to have been raped and molested *** in 2015. And at the same time, she was diagnosed with an illness. In which she spoke to, *I believe my wife told me*, two doctors; and told them that she had never had sex with anybody at this same time in 2015." (Emphasis added.)

During an exchange with defense counsel, the trial court stated, "[W]hen we finally got [the medical records], the State may have actually stipulated to their content, had the parties wanted to use them?" Defense counsel responded, "There was a stipulation. We did subpoena [the medical records]. They got in late. *** But there was a stipulation." Defense counsel explained that, before J.B. was diagnosed with cancer, the doctor indicated that she was possibly pregnant and asked if she was sexually active. Counsel added, "And I believe her mother was in the room with her at the time, from my memory, if it serves me correctly. But she said, no, I haven't had sexual intercourse. I believe the State stipulated to that fact, that she said that to the doctor."

¶ 14    In rejecting defendant's ineffective assistance claim, the trial court remarked, "Turning to the subpoena for the medical records. Counsel did pursue that, and did get them. And convinced the State to stipulate to the important part, for the defense at least, regarding that. So the jury did hear what the defense wanted in that regard." The trial court then heard arguments on the other issues raised in the posttrial motion. The trial court denied the posttrial motion and imposed sentence. This appeal followed.

¶ 15                                   II. ANALYSIS

¶ 16    Defendant argues that the trial court erred in refusing to appoint new counsel to assist him with his posttrial claim that, by allowing the trial to proceed before receiving J.B.'s medical records, defense counsel failed to provide him with effective assistance of counsel. We evaluate ineffective-assistance-of-counsel claims under the two-prong *Strickland* test. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). *Strickland* requires a showing that counsel's performance "fell below an objective standard of reasonableness" and that the deficient performance was prejudicial in that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

¶ 17    *Pro se* claims of ineffective assistance of counsel are evaluated under the common-law procedure developed in *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny. As our supreme court explained in *People v. Roddis*, 2020 IL 124352, ¶¶ 35-36:

> "Under the common-law procedure, a *pro se* defendant is not required to file a written motion but need only bring his or her claim to the trial court's attention. [Citation.] New counsel is not automatically appointed in every case when a defendant presents a *pro se* posttrial motion alleging ineffective assistance of counsel. [Citation.] Rather, when a defendant makes such a claim, the court should first examine the factual basis of the defendant's claim. [Citation.] *If the court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the pro se motion.* [Citation.] However, if the allegations show possible neglect of the case, new counsel should be appointed. [Citation.]
>
> New counsel would then represent the defendant at the hearing on the *pro se* ineffective assistance of counsel claim. Appointed counsel can independently evaluate the claim and avoid the conflict of interest that trial counsel would have in trying to justify his or her own actions contrary to the defendant's position. [Citation.]" (Emphasis added.)

We note that, although defense counsel himself raised defendant's ineffectiveness claim, there is no dispute that the claim is subject to the *Krankel* procedure.

¶ 18    In determining whether to appoint counsel, the trial court considers the merits of the ineffective assistance claim in their entirety. *Id.* ¶ 61. "[I]f the trial court has properly conducted a *Krankel* inquiry and has reached a determination on the merits of the defendant's *Krankel* motion, we will reverse only if the trial court's action was manifestly erroneous." *People v. Jackson*, 2020

IL 124112, ¶ 98. A decision is manifestly erroneous when arbitrary, unreasonable, and not based on the evidence. *People v. Ceja*, 204 Ill. 2d 332, 347 (2003).

¶ 19    Defendant argues that the trial court's decision was manifestly erroneous because it was not based on the evidence. The trial court was under the misimpression that the jury was made aware of the germane aspects of the medical records through a stipulation. In fact, no such stipulation was ever presented to the jury.

¶ 20    Although it is true that the trial court's decision was based on reasoning that was not supported by the evidence, "[w]e review the trial court's judgment, not its reasoning, and we may affirm on any basis called for by the record." *People v. Mueller*, 2018 IL App (2d) 170863, ¶ 16. Leaving aside the trial court's mistaken belief that the jurors heard a stipulation equivalent to the evidence that defendant argues should have been presented through J.B.'s medical records, it is abundantly clear from the record on appeal that defendant failed to show possible neglect of the case. To the contrary, defendant's ineffectiveness claim was entirely speculative. Accordingly, the trial court was not obligated to appoint new counsel to assist defendant with that claim.

¶ 21    As noted, to satisfy the prejudice prong of the *Strickland* standard, a defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Although defendant contended that the medical records would have shown that J.B. denied ever having had sexual intercourse, the record on appeal provides no support for that contention. Defendant did not suggest that he had ever actually seen the medical records. He merely stated that his wife had told him that J.B. had told her doctors that she had "never had sex with anybody at this same time in 2015." Defendant's claim implicitly assumes that, if J.B. had made such a statement, it would appear in the medical records. We cannot join in that assumption. J.B.'s alleged statement was in response to concerns that her enlarged abdomen

was the result of pregnancy. However, her physician(s) diagnosed her with a tumor that apparently mimicked the appearance of pregnancy. It is by no means clear that her sexual history was germane to that diagnosis, and we cannot simply assume that her physician(s) would have included any statements pertaining to her sexual history in her medical records.

¶ 22     Defendant also argues that his description of the subpoenaed medical records matched both defense counsel's description of the records during the *Krankel* hearing and the prosecutor's description during pretrial proceedings. The flaw in the argument is that, as seen, defendant did not describe the medical records themselves, but merely described statements J.B. allegedly made during her medical appointment. The same is true of defense counsel's remarks during the *Krankel* hearing. Defense counsel advised the trial court, incorrectly, that the parties stipulated that, during her medical appointment, J.B. told her physician(s) that she had not had intercourse. Defense counsel did *not* suggest that there was any stipulation as to the content of the medical records, and we cannot conceive of how there could have been such a stipulation, given that the parties had not seen the medical records until after the jury began its deliberations.

¶ 23     Finally, defendant's contention that his description of the subpoenaed records matches the prosecutor's description at a pretrial hearing is ludicrous. The prosecutor merely indicated what the medical records "may" have said and what defense *hoped* to establish with the records. The prosecutor never suggested he was confident as to what the records said or that the defense would be successful. Indeed, the prosecutor made these remarks before even receiving the records. The prosecutor had no way of knowing whether they would have any impeachment value.

¶ 24     As discussed, the medical records themselves, although received and reviewed by the trial court, are absent from the record on appeal. Under *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984), doubts arising from the incompleteness of the record should be resolved against the

defendant (the appellant) and in favor of the judgment. Having reviewed the medical records, the trial court stated that the records added nothing to the case. Because the records are not part of the record on appeal, we must assume the trial court's assessment was correct. We note that, although the absence of the medical records from the record on appeal is a serious impediment to appellate relief, defendant might still be able to obtain relief through a proceeding under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2022)). However, we express no opinion on the likelihood of success in that endeavor.

¶ 25    In an effort to circumvent *Foutch*, defendant contends, in essence, that because defense counsel did not obtain the medical records before trial, *the trial court record* is incomplete, not *the record on appeal*. Citing *People v. Carter*, 2021 IL 125954, ¶ 39, defendant argues that *Foutch* does not apply under these circumstances. We disagree. As noted, the trial court reviewed medical records *in camera*. "Even where a party is not privy to materials reviewed *in camera* *** that party can request the circuit court to submit those materials under seal for appellate review." *Cascade Builders Corp. v. Rugar*, 2021 IL App (1st) 192410, ¶ 28. In *Robinson v. Township High School District 113*, 2022 IL App (2d) 210107 ¶¶ 2,17, which we cite as persuasive authority under Illinois Supreme Court Rule 23(e)(1) (eff. Feb. 1, 2023), we held that *Foutch* required affirmance of the trial court's *in camera* determination that certain emails were exempt from disclosure under the Freedom of Information Act (5 ILCS 140/1 *et seq.* (West 2018)), where the e-mails were not included in the record on appeal.

¶ 26    Moreover, even assuming, *arguendo*, that the contents of the medical records included J.B.'s supposed denial that she had intercourse, there was no reasonable probability that using that statement to impeach J.B. would have resulted in an acquittal on any of the charges. Defendant advised the trial court that the medical records would reveal that J.B. told her doctors, not merely

that it was "impossible" that she was pregnant, but that "she had never had sex with anybody at this same time in 2015." Notably, however, J.B. testified that, before her medical examination, she told her mother and defendant that she was not sexually active. Defendant suggests that J.B.'s supposed statement to her doctors that she "never had sex with anyone" would have more definitively impeached her testimony that defendant sexually assaulted her. J.B. made clear that she did not want to reveal to her mother that defendant had sexually assaulted her, and J.B.'s mother was supposedly present when J.B. spoke to the doctors. Thus, J.B. was far less likely to speak candidly on that topic with her mother present. Under these circumstances, there is no reasonable probability that the jury would have given any significant weight to J.B.'s alleged statements during the medical examination.

¶ 27 We stress that, notwithstanding our conclusion that defendant was not entitled to new counsel to pursue defendant's ineffectiveness claim, we are deeply troubled by defense counsel's false statements during the *Krankel* hearing regarding an imaginary trial stipulation. We have no reason to believe counsel deliberately misled the court. However, we caution counsel to exercise greater care when making such representations. Nonetheless, although the trial court's decision was based on a false premise (as a result of counsel's false statements), the record simply provides no support for defendant's claim of ineffective assistance of counsel. Accordingly, defendant was not entitled to new counsel to assist him in pursuing that claim.

¶ 28                                  III. CONCLUSION

¶ 29 For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 30 Affirmed.