2020 IL App (1st) 170368-U

THIRD DIVISION
June 30, 2020

No. 1-17-0368

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 10618 |
| | ) | |
| JACQUELYN GRECO, | ) | Honorable |
| | ) | Marc William Martin, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Ellis and Justice McBride concurred in the judgment.

ORDER

¶ 1    *Held*:   Defendant's conviction of murder is reversed and the case is remanded for a new trial; defendant presented sufficient evidence to require the trial court to instruct the jury on her proffered defense of withdrawal and the trial court's refusal to give the requested instruction was an abuse of discretion.

¶ 2    In 2013 the State charged defendant, Jacqueline Greco, with the 1979 murder of Carl Gaimari, defendant's then-husband. Two gunmen entered the home where defendant and the victim lived. The gunmen tied up defendant and their children, and locked them in a closet, and shot the victim to death with the victim's own guns. The State's theory was that defendant aided in the execution of a plan to kill defendant's husband. Following a trial before a jury, the circuit court of Cook County convicted defendant of first degree murder and sentenced her to 30 years

in the Illinois Department of Corrections. Defendant appeals on several grounds including that the trial court erroneously refused to instruct the jury on withdrawal as a defense.

¶ 3     For the following reasons, we reverse defendant's conviction and remand for a new trial not inconsistent with this order.

¶ 4                                  BACKGROUND

¶ 5     In April 1979, two men entered the home shared by defendant, the victim, and their four minor children. Defendant's children are daughters Becky, Bobbie, and Carlee, and son Nicholas. Becky was 16-years old at the time of the murder, Bobbie was 13, Carlee was 5, and Nicholas was 2-years old at the time their father was murdered. On the day of the murder Becky had gone to school and defendant, Bobbie, Carlee, and Nicholas remained at home. Defendant told police she had been lying on the bed in the master bedroom with Carlee when Bobbie entered the room with her hands tied behind her back and a man standing behind her (Bobbie). The man asked where the money was. One of the men took defendant to get Nicholas from his room and they all returned to the master bedroom. Defendant told police the man put her, Bobbie, Carlee, and Nicholas in the master bedroom closet.

¶ 6     Becky testified she returned home from school at approximately 2:40 p.m. Becky normally entered the home through the back door and when she arrived on this day she noticed the back door was ajar. Becky testified she found this unusual because that door was always supposed to be locked and she had been disciplined for failing to do so in the past. Becky testified the door was locked when she left for school that morning and that defendant later told her that Bobbie left the door open when she (Bobbie) had gone outside for something (defendant did not say what Bobbie went outside for). Once inside Becky found the garage door open, some dining room cabinets open, and items strewn about the floor in several rooms which was also

unusual. Loud music played in the background. The door to the basement was also open, so Becky went downstairs where she saw what she thought was the victim, her father, sitting on the couch resting. Becky testified she left him and went through the house again and upon venturing into the master bedroom she heard mumbling from the closet. The closet door was secured with a fireplace poker. Becky opened the door and discovered defendant and Bobbie at the front of the closet, bound at the hands, and Carlee and Nick at the back of the closet. Defendant asked Becky where her father was and Becky told her that he was in the basement. Bobbie ran to the basement but returned shortly thereafter acting hysterical. Becky testified that defendant then went downstairs and told Becky her father had been shot. Becky called police.

¶ 7     Becky had testified that she found it unusual that Bobbie was home when Becky returned from school. Becky also testified that she did not recall telling police that both Bobbie and Carlee had stomach aches on the day of the murder or that Bobbie sometimes tries to skip school. During trial, on cross-examination, defendant's attorney confronted Becky with an interview she gave to police in 1979. Becky testified she did not recall the contents of that conversation. Defense counsel also confronted Becky with an interview with police conducted in 2012, but Becky again testified she could not recall the contents of that conversation. The defense called neither officer who interviewed Becky to testify.

¶ 8     The first officer to arrive at the scene testified at defendant's trial that he went to the basement and saw defendant sitting or kneeling in front of a man on the couch. The officer described defendant as crying and distraught. The victim had a handgun in the crook of his right elbow and another gun lay about 10 feet away. The officer took defendant upstairs and interviewed her and two teenagers. The officer testified that defendant told him that at approximately 12:30 p.m. two men had come through the back door of the home and announced

a robbery. The men tied up the occupants of the home and put them in a closet. The officer testified defendant told him that after about an hour she heard three or four muffled sounds coming from the basement which she believed to be gunshots. The officer testified that after detectives arrived he went outside to secure the crime scene. At some point Sam Greco arrived and tried to enter the house. Greco was defendant's paramour during her marriage to the victim.

¶ 9 One of the detectives to respond to the murder testified that he spoke to defendant first at the scene then again later that evening at a neighbor's house. Defendant told substantially the same story to the detective as she had to the first officer. When the detective spoke to defendant at the neighbor's house Greco was also present. During this second interview defendant stated to the detective that when the man brought Bobbie to the bedroom, Bobbie's hands were tied behind her back and that the man asked where the money was. The detective also testified that during the second interview defendant stated that the victim was a wealthy man with a net worth of $1 million.

¶ 10 Defendant's sister, Elsie Fry, went to defendant's home the night of the murder. Fry testified that when she arrived defendant was sitting in a police car and was crying. Fry testified defendant looked at her and said, "I didn't do it." That night, defendant and the children stayed at her sister Elsie Fry's house. Fry testified that defendant seemed "kind of calm" that night and did not seem upset. Fry speculated defendant might have been in shock.

¶ 11 The next day, defendant and Greco went to the office where the victim worked as a trader. The owner of the company testified defendant tried to get money from the victim's account for "expenses for the children" but he would not give it to her. Later, the victim's seat on the Board of Trade was sold. The victim also had funds in his account at his company. Greco

moved into defendant's home a week after the murder. Defendant and Greco married that August and later moved the family to California.

¶ 12    The evidence at defendant's trial established that both she and the victim had extramarital affairs during the marriage. Approximately one year before the murder, defendant told James Sances, the son-in-law of her sister Elsie Fry, that she wanted to leave the victim and asked Sances if he knew of any drugs that would make it look like a person had a heart attack. Sances testified he told defendant she should just get a divorce and defendant responded that if she did she would get nothing. Sances testified he knew the victim was physically abusive of defendant but Sances did not think anything of defendant's comment about the drug. Elsie Fry also testified that in 1979 before the murder defendant said to Fry "we figured out a way to kill Carl." Defendant purportedly said, "someone was going to break in and tie [defendant] up and kill Carl." Fry believed the "someone" defendant was referring to was Greco. Also before the murder, the victim loaned Fry and her husband money for their gas station business. The victim told Fry not to worry about paying back the loan. Fry testified she and her husband did start to pay back the victim and, after the murder, continued to pay back the loan to defendant and Greco.

¶ 13    In December 1980 defendant and Greco sued Fry and her husband for the balance of the loan. Fry and her husband took out another loan and paid back defendant and Greco, and they dropped the lawsuit. Fry had still told no one about the conversation between her and defendant about killing the victim. In March 1981 Fry did tell her daughter about the conversation with defendant about killing the victim. Fry's daughter told Becky about the conversation and later, police contacted Fry. Fry told police about the conversation with defendant that same month.

Fry agreed she did not tell police about the alleged conversation with defendant in 1979 until after defendant and Greco sued Fry and her husband and that the lawsuit upset her (Fry).

¶ 14    In 2012 police contacted Fry and asked her to record a telephone conversation with defendant. Fry agreed, police obtained an order for a consensual overhear, and on February 14, 2013 police recorded two conversations between Fry and defendant. For the first call, Fry called defendant.

¶ 15    Fry told defendant police had been asking her a lot of questions and that she "might have to go in front of the Grand Jury and tell it again." Fry said she was nervous and asked defendant if defendant remembered "what you told me." Defendant asked if Fry was "going to do that though, to me?" and Fry responded she would have to and that she had already "told it to the State's Attorney years ago" so "they have it on record and I have to tell the truth." Defendant stated: "Please don't. Please don't do that Tootsie, just tell them that I wished he was dead, don't tell them I said that. Please." Fry stated police already had it "on record" and defendant stated "I didn't do it. *** I didn't do it though. I didn't do it though," whereupon the following exchange occurred:

> "Fry: I know you didn't do it honey, I know you didn't do it. But you told me how it was going to be done, how they were going to break in and tie you up and put you in the closet and then kill Carl. ***.
>
> Defendant: Yeah, oh my God.
>
> * * *
>
> Fry: Is there anything you can tell me that I should know? Anything else?

Defendant: No honey, I didn't, I didn't do it though. The guy disappeared; the guy, friend, the trader downtown, and he was putting locks on the doors. He was involved with, Lou Taylor, I didn't know whatever his name was."

¶ 16 Later in the conversation Fry asked defendant if she knew who did it and defendant responded "No. I don't. I wish I did." Defendant then said, "You are going to put me in jail, Tootsie; you're going to put me in jail." Fry responded she would not put defendant in jail and that she had previously told the State's Attorney that she (Fry) "would go to jail first before they made you [(defendant)] go to jail." Defendant responded "No, I don't want that to happen. Do you think you can think of something you could say could you just tell them that." Fry asked what defendant meant and defendant said she was referring to an incident between her and the victim during which the victim allegedly put a gun to defendant's head and threatened to kill her. Later defendant asked Fry to lie for her. Defendant asked Fry to say she (Fry) was "all confused and don't remember?" After further conversation during which Fry recounted what she told police and expressed that she did not desire to be a witness against defendant, in reference to what Fry told police, defendant stated "That's enough, 'cause that's exactly what happened." Defendant stated she was going to jail for the rest of her life and Fry responded she would not because "you [(defendant)] didn't know who was going to come in and do it. You didn't know who was going to come in, did you?" to which defendant responded "No." At one point defendant stated, without prompting, "I wonder if Sam [(Greco)] did have something to do with it." Defendant stated she did not know for sure. Defendant said: "your testimony is enough to put me away. Because I told you exactly what was going to happen. And I'd be a son of a bitch if it didn't happen like that."

¶ 17    Fry and defendant continued their exchange with defendant stating that she was going to jail and Fry trying to comfort her that she would not because she was innocent.  At one point defendant said: "That is enough to put me away.  Not that I killed him but that I knew."  Later, defendant said to Fry: "There's got to be some way you can help me.  You gotta, I am not asking you to lie, but to tell them you were confused, or something that I wished somebody would kill him or something."  Later, defendant also said: "That is what I wanted to happen but then I didn't want it to happen.  I didn't want to take my children's father away."  Later in the conversation, defendant continued: "Tootsie, can't you tell them that after it happened I was crying and said I wished it would have happen [*sic*] that way, I wished they would have done it just like they did, you know, that I wished they did it but I didn't want it to happen or something."  Later, defendant told Fry: "it is okay, you did what you, you only told the truth, I said it, I know I said it.  But I swear to God on my kids' lives I didn't' do it!"  Defendant asked Fry to tell police that she only "wished that would happen" and that defendant was "hysterical when [she] did because I [(defendant)] had nothing to do with it."  Fry asked defendant if Greco "would've been the one who planned it all out" to which defendant responded, "I guess, yeah."  Fry asked defendant if Greco planned everything, and defendant responded "I don't remember, I don't even remember what I said to [Sances.]"  Fry responded: "Okay, but if [Greco,] [Greco] is the one who planned it, he is the one who told you, right?  How it was going to be?  Otherwise, how would you know?"  Defendant responded:  "Right."  Defendant continued that the victim used to beat her and that "there were lots of times I wished he was dead but the kids—."  After another brief exchange Fry's call to defendant ended.

¶ 18    A short time later, with police still with Fry, defendant called Fry back.  Defendant asked Fry when she was to testify and Fry said she did not know.  Defendant then said "well, do you

remember after this all went down when I said I told him not to do it? Do you remember me saying I told him not to do it? He said he didn't do it, I believed him." Defendant continued:

> "He came out and he swore he didn't do it, swore he didn't do it. I said he didn't do it, didn't know who did it. Yeah, I said that because that is what he told me he was going to do. And I told him not to and I didn't think he was going to do it."

> Fry: Okay.

> Defendant: But he already did it."

Defendant implored Fry to "say the things like I said, like I told him not to, I didn't want to *** didn't do it."

¶ 19     The State, over defendant's objection, published the phone calls to the jury and the trial court admitted the transcripts for demonstrative purposes only.

¶ 20     In May 2014, defendant's attorney took a statement from Fry in the presence of an investigator. The statement is handwritten by defendant's attorney and signed by Fry. It states: Fry remembers the conversation between herself and defendant in February 1979. Defendant told Fry "about how Sam Greco had approached her with a plan to kill Carl. Sam wanted to make it look like a home invasion. [Defendant] told [Fry] she [(defendant)] put a stop to the plan and that she would not have anything to do with it." According to the written statement, Fry was close to the victim and if Fry had not believed defendant "put a stop to Sam's plan" Fry would have warned the victim. Fry stated she was not aware if defendant told her husband about Greco's plan but shortly after her conversation with defendant the victim put new locks on doors to his home that previously did not have locks. Fry stated defendant "broke off her relationship with [Greco.]" Fry never told police about her conversation with defendant because "she

believed [defendant] had taken all steps necessary to prevent it from happening." Fry told defendant's attorney that on the day of the murder "she never thought about the conversation *** with [defendant] or that Sam Greco had killed Carl, or had him killed." Fry stated defendant had been taken advantage of by men all of her life and that when the victim died defendant "allowed Sam [Greco] to step in and take over." Fry told the attorney that after defendant and Greco filed the lawsuit "she was very angry and for the first time, because she was angry she told someone about [defendant's] conversation." Fry allegedly stated she exaggerated the conversation out of anger. Fry stated she told police about defendant's refusal to take part in Greco's plan and as a result police did nothing. Fry asserted she initially refused to participate in the call to defendant with police but detectives convinced her doing so would help catch the real killers. Fry asserted police told her what to say on that call. The bottom of the handwritten statement contains a statement that "I signed the statement because I knew it was true." Fry signed the statement.

¶ 21    Also in May 2014, the parties took an evidence deposition of Fry due to concerns about her health. During her deposition, Fry testified that in February 1979 defendant "started to tell [her] that they had a plan that how they were gonna kill Carl." Fry testified that in March 1981 she told her oldest daughter about that conversation with defendant because Fry was upset about the lawsuit to recover the balance on the loan. Fry eventually told police about the conversation that same month. In the deposition Fry testified she did not read her statement to defendant's attorney at the time. Fry did not remember the attorney reading the statement to her prior to her signing it. Fry testified she did not remember defendant ever saying to her that she tried to put a stop to Sam's plan to kill Carl. Fry agreed she did not tell police that defendant said she tried to stop Greco's plan to kill the victim and on the recorded conversation Fry did not say that she remembered it when defendant claimed to have told her she tried to stop Greco's plan. Fry

testified in the deposition that it is not true that she exaggerated the conversation out of anger and that she was not forced to talk to police in 1981. Fry testified in the deposition, regarding the written statement, that she did not remember telling police in 1981 about defendant's refusal to take part in Greco's plan.

¶ 22 On cross-examination at the deposition Fry agreed she had written letters to defendant about wanting to speak to defendant's attorney. Defendant's attorney asked Fry if she (the attorney) told Fry what she was writing and Fry said, "I think so." Fry did not remember going through the entire statement with the defense attorney. Fry did not remember the attorney reading the statement aloud to her and going through the statement together. Fry did remember that defendant's attorney's pen ran out of ink as she was writing and that the attorney had to borrow Fry's pen with darker ink. Fry remembered seeing the writing on the statement get darker (as is reflected in the record). Fry identified her signature at the bottom of each page of the written statement. At the deposition, Fry testified she "said I signed this statement because I know it was true." Fry identified her signature and was asked if she signed the statement because she knew it was true and Fry testified "Yes." Fry also testified that the first time she told anyone about the 1979 conversation between herself and defendant was after receiving the lawsuit and that the lawsuit upset her. The first time she spoke to police was in March 1981 after her daughter told Becky about the conversation and, apparently, Becky contacted police.

¶ 23 Fry testified she did not exaggerate the conversation out of anger because she does not get angry; she was just upset that she had been sued "and had to tell somebody." Fry did not recall telling defendant's attorney and investigator that she exaggerated the conversation out of anger. Fry did recall telling police, at the police station, about the conversation in which defendant said, "we have a plan to kill Carl." At the deposition Fry recalled telling police

someone was going to break in, tie up defendant and put her in the closet, and kill Carl." She did not say that Greco was going to break in. Fry did not recall telling police that the lawsuit against her and her husband was dropped after her daughter called Greco and threatened him with the information Fry had given her about Fry's conversation with defendant. Fry told police that defendant had asked Fry to come to defendant's home on the morning of the murder but Fry did not go because she had plans that day. Fry testified that after her conversation with police in March 1981 defendant was not charged with a crime.

¶ 24 Fry testified at the deposition that at the time of her conversation with defendant regarding the alleged plan, defendant and the victim reconciled and began working on their relationship. They went on a ski trip together. They were working on their marriage and defendant was not talking to Greco. Fry testified the statement in the written statement that Greco called Fry looking for defendant was true—Fry testified that was why she did not believe defendant at that time. Fry did not warn Carl because she did not believe defendant.

¶ 25 Fry testified it is possible she simply does not recall defendant's attorney reading the statement to her. She admitted she had something on her mind that day. Fry agreed she signed the statement and that she wrote the affirmation, that she signed the statement because it was true, in her own handwriting. Fry agreed she received a copy of the statement and read it and that she did not call defendant's attorney to say there were any mistakes in the statement. When asked if the statement is true Fry testified at the deposition that, "Well, some of the thing that are—weren't exactly, you know, like—like I didn't know—like she didn't tell me that they—her and Sam had broken up. I didn't know that." Fry explained "sometimes things just come out and you don't mean it the way it's said." Fry testified she knew Carl kept guns in the closet because she cleaned the house. Fry testified Carl kept them "way up high."

¶ 26    At trial, Fry testified defendant's attorney "put words in her mouth." Fry testified that defendant's attorney read each page aloud to Fry as the attorney was writing it, that she (Fry) signed each page, and that she only had the opportunity to read the statement for herself after the attorney and investigator left. Fry denied saying anything contained in the statement.

¶ 27    Defense counsel later informed the trial court she declined to perfect her impeachment of Fry and Becky as a matter of trial strategy based on counsel's belief doing so would allow the State to introduce defendant's statement to police.

¶ 28    The State presented forensic evidence concerning the murder and rested its case.

¶ 29    The defense did not call any witnesses.

¶ 30    The defense requested the jury to be instructed on the offense of conspiracy as a lesser-included offense of murder. Over the State's objection, the trial court agreed with the defense but held it would modify the instruction to include language on criminal culpability for acts of coconspirators pursuant to the United States Supreme Court's decision in *Pinkerton v. United States*, 328 U.S. 640 (1946). Based on that ruling by the trial court the defense withdrew the request for the conspiracy instruction. Defendant's attorney also requested an instruction on the defense of withdrawal, which the trial court refused. The jury found defendant guilty of murder. The trial court denied defendant's posttrial motion for a new trial and motion to reconsider. Following a sentencing hearing, the trial court sentenced defendant pursuant to the law in effect in 1979.

¶ 31    This appeal followed.

¶ 32                                    ANALYSIS

¶ 33    On appeal defendant argues (1) the State failed to prove her guilty beyond a reasonable doubt of murder because the evidence did not establish the "aided and abetted" element of the

offense of murder based on accountability; (2) she was denied her right to counsel because her trial attorney was ineffective in: (a) failing to impeach Fry with her deposition, (b) in failing to perfect the impeachment of Fry based on Fry's written statement to defendant's attorney, and (c) failing to perfect the impeachment of Becky based on Becky's statements to police; (3) she was denied her right to a fair trial by the trial court's error in requiring an amendment to the pattern jury instruction on conspiracy causing the jury not to be instructed on a lesser-included offense to the charge against her; (4) she was denied her right to a fair trial by the trial court's refusal to instruct the jury on the defense of withdrawal to a charge of murder based on accountability; and (5) she was denied her right to a fair trial by the prosecutor's pervasive improper comments during closing arguments.

> "When the sufficiency of the evidence is challenged, a criminal conviction will not be set aside unless the evidence, when viewed in the light most favorable to the prosecution, is so improbable or unsatisfactory that a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt." *People v. Flynn*, 2012 IL App (1st) 103687, ¶ 22.

¶ 34    In this case the State prosecuted defendant based on accountability for the acts of others in killing her husband.

> "A person is legally accountable for the conduct of another if '[e]ither before or during the commission of an offense, and with the intent to promote or facilitate [such] commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense.'  720 ILCS 5/5-2(c) (West 2010)." *Flynn*, 2012 IL App (1st) 103687, ¶ 23.

¶ 35 Further, "our supreme court has held that the accountability statute has been interpreted as meaning that where one aids another in the planning or commission of an offense, he is legally accountable for the conduct of the person he aids; and that the word 'conduct' encompasses any criminal act done in furtherance of the planned and intended act. [Citations.]" *Flynn*, 2012 IL App (1st) 103687, ¶ 30. A person is *not* legally accountable for the conduct of another if

"before the commission of the offense, he or she terminates his or her effort to promote or facilitate that commission and does one of the following: (i) wholly deprives his or her prior efforts of effectiveness in that commission, (ii) gives timely warning to the proper law enforcement authorities, or (iii) otherwise makes proper effort to prevent the commission of the offense." 720 ILCS 5/5-2(c)(3) (West 2018).

¶ 36                                    (a) Withdrawal Instruction

¶ 37 We first address defendant's argument the trial court improperly denied the defense's request to instruct the jury on the defense of withdrawal. The jury was not instructed that it could find defendant not guilty if it found that she aided in the planning of the murder but that she withdrew from the criminal plan and attempted to neutralize the effects of her efforts. Because we find there is some foundation for a withdrawal instruction in the evidence we find the trial court's refusal to instruct the jury on the defense of withdrawal in this case was error.

"The function of jury instructions is to convey to the jury the appropriate principle of law so that it may apply the correct legal principles to the facts and arrive at the proper conclusion according to the law and evidence. [Citation.] It is well established that a defendant is entitled to the benefit of any defense shown by the entire evidence even if the facts on which the defense is based are

inconsistent with defendant's own testimony and that very slight evidence upon a given theory of the case will justify the giving of an instruction. [Citation.] However, where the evidence presented at trial is insufficient to meet this minimal standard, it is proper to deny a requested instruction." *People v. Wallace*, 100 Ill. App. 3d 424, 430 (1981).

¶ 38    "[O]nly slight evidence is required to support a defendant's requested instruction." *People v. Washington*, 399 Ill. App. 3d 664, 678 (2010). "A defendant in a criminal case is entitled to have the jury instructed on any legally recognized defense theory which has some foundation in the evidence, however tenuous." (Internal quotation marks and citations omitted.) *People v. Goods*, 2016 IL App (1st) 140511, ¶ 47. Specifically, "[a] defendant is entitled to an instruction on withdrawal when, at trial, there is some evidence adduced that defendant: (1) terminated his efforts to promote the crime and (2) made an effort to neutralize the effect of his conduct as set forth in the statute." *People v. Richard*, 90 Ill. App. 3d 322, 332 (1980). Thus the specific issue presented for review is whether there is any evidence in the record upon which the jury could have conceivably concluded that defendant had withdrawn from the criminal enterprise." *Wallace*, 100 Ill. App. 3d at 430. "When the trial court, after reviewing all the evidence, determines that there is insufficient evidence to justify the giving of a jury instruction, the proper standard of review of that decision is abuse of discretion." *People v. McDonald*, 2016 IL 118882, ¶ 42. "Common sense dictates that, for a reviewing court to determine whether the trial court abused its discretion, it must undertake a review of the relevant evidence. This is necessary because an abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *Id.* ¶ 32.

"Whether a particular jury instruction accurately conveyed to the jury the law applicable to the case, however, is an issue that we review *de novo*." *People v. Nere*, 2018 IL 122566, ¶ 29.

¶ 39    Defendant argues the evidence in the record upon which the jury could have concluded she had withdrawn from the plan to kill Carl can be found in the evidence the State presented through Fry. Defendant argues this evidence consists of:

1. Fry's pretrial written statement that in the 1979 conversation defendant told Fry that defendant "put a stop to it and that [defendant] would not have anything to do with it."

2. Fry's pretrial written statement that Fry believed defendant had done everything necessary to stop the crime from happening.

3. Defendant's statement in the first recorded call with Fry that defendant "didn't do it."

4. Defendant's statement in the first recorded call with Fry that defendant "wanted [it] to happen but then *** didn't want it to happen. I didn't want to take my children's father away."

5. Defendant's statement in the second recorded call from defendant to Fry asking Fry if Fry remembered defendant saying, "I told him not to do it."

6. Defendant's statement in the second recorded call from defendant to Fry asking Fry if Fry remembered defendant saying, "I told him not to do it."

7. Defendant's statement in the second recorded call from defendant to Fry that the plan was "what he told me he was going to do. And I told him not to do it and I didn't think he was going to do it."

Defendant also argues that circumstantial evidence supports finding she had withdrawn from the plan to kill her husband. Defendant argues the circumstantial evidence that would have supported her defense includes evidence that she and Carl were reconciling their marriage at the

time of the murder and that both of them had ended their extramarital affairs. Defendant asserts that the foregoing is "at least slight evidence meriting a withdrawal instruction." Defendant further argues the evidence is sufficient to permit the jury to find that she made a "proper effort to prevent the commission of the offense." 720 ILCS 5/5-2(c)(3) (West 2018). Defendant argues her withdrawal was timely as evidenced by available evidence that defendant told Greco not to go through with the plan and Fry's belief defendant had stopped the plan.

¶ 40    The State responds defendant presented no evidence "she terminated her involvement in Carl's murder, or that she ever neutralized her actions that facilitated the murder." The State argues that defendant's statements that she "didn't do it" and that she "didn't want it to happen. I didn't want to take my children's father away" even if true do not provide evidence that defendant took any action to terminate her efforts to promote the crime; nor, the State argues, do defendant's statements in the second recorded conversation "demonstrate that defendant took adequate action to terminate her efforts." The State also argues that even if the claim on the second call is true any withdrawal was not timely because "it apparently occurred after the act was already committed." (Emphasis omitted.) Further, the State argues defendant has not shown how her alleged reconciliation with her husband is relevant to whether she withdrew from the plan to murder him, and there is "no evidence that defendant made any effort to neutralize the effect" of her earlier conduct.

¶ 41    Initially, we note the State's arguments attacking the veracity and weight of defendant's evidence of withdrawal are misplaced. The State argues the trial court did not abuse its discretion in refusing to instruct the jury on withdrawal because Fry disavowed the statements in the written statement taken by defendant's attorney, the written statement is "dubious" because Fry testified defense counsel was "putting words in her mouth," Fry did not recall defendant

saying she had put a stop to the plan to kill Carl, and the veracity of defendant's statement in the recorded phone calls is "unlikely" because Fry had just informed defendant Fry had told police about defendant's statements about planning to kill Carl and defendant was merely "trying to cover the decades-old evidence pointing to her involvement." However, as defendant initially argued, "[i]t is not the province of the trial court to weigh the evidence when deciding whether a jury instruction is justified. [Citations.] *McDonald*, 2016 IL 118882, ¶ 25. "Requiring that *credible* evidence exist in the record risks the trial court invading the function of the jury and substituting its own credibility determination for that of the jury." (Emphasis added.) *Id.* "It is the trier of fact's responsibility to determine the credibility of witnesses, weigh testimony, resolve conflicts in evidence, and to draw reasonable inferences therefrom." *People v. Williams*, 193 Ill. 2d 306, 338 (2000). "Where the truth must be ascertained from a debatable set of circumstances, it is a matter for the trier of fact." *People v. Bowman*, 138 Ill. 2d 131, 139 (1990). Thus,

> "[a] defendant is entitled to an instruction on his [or her] theory of the case if there is some foundation for the instruction in the evidence, and if there is such evidence, it is an abuse of discretion for the trial court to refuse to so instruct the jury. [Citation.] Evidence, however slight, supporting an affirmative defense entitles the defendant to an instruction [citations], even if the evidence is conflicting and the defendant's testimony is impeached." *People v. Sims*, 374 Ill. App. 3d 427, 432 (2007).

Because the question is not whether the jury was likely to believe defendant's evidence of withdrawal but rather "whether there is any evidence in the record upon which the jury could

have conceivably concluded that defendant had withdrawn from the criminal enterprise" (*Wallace*, 100 Ill. App. 3d at 430), these arguments fail.

¶ 42    We also reject the State's arguments the propounded evidence could not lead the jury to conclude defendant terminated her efforts to promote the offense or took steps to neutralize the effect of her conduct.  See *People v. Richard*, 90 Ill. App. 3d 322, 332 (1980) ("A defendant is entitled to an instruction on withdrawal when, at trial, there is some evidence adduced that defendant: (1) terminated his efforts to promote the crime and (2) made an effort to neutralize the effect of his conduct as set forth in the statute.").  We believe the trier of fact could reasonably infer defendant terminated her involvement in the criminal plan from, among other evidence, defendant's statement "I told him not to do it," if it believes defendant made that statement.  The jury could also reasonably infer defendant terminated her involvement from, *inter alia*, defendant's statements she "didn't want it to happen" and "didn't want to take [her] children's father away."  We also find a reasonable trier of fact could find defendant made an effort to neutralize the effect of her conduct in aiding in the planning of the murder by telling "him not to do it," among other evidence; and the trier of fact could reasonably infer defendant made an effort to neutralize her conduct from evidence including but not limited to defendant's belief, if believed, that "I didn't think he was going to do it" and Fry's belief that defendant had done everything necessary to stop the crime from happening.  We also reject the State's argument that the only possible characterization of defendant's statement on the recorded phone call is that she was telling Fry that she told the perpetrators not to go through with the murder only after it had already occurred.  Defendant's meaning could also reasonably be that she told them not to do it before the murder occurred but they had already committed the crime by the time of defendant's phone call with Fry or a subsequent conversation with Greco after telling him not to do it.  The

statements are sufficient to support giving the instruction; what the statements specifically mean is for the trier of fact to determine. *Williams*, 193 Ill. 2d at 338.

¶ 43    Consequently we hold defendant is entitled to a new trial. "When the evidence raises the basis for the instruction, a trial court's refusal results in a denial of defendant's due process and entitles a defendant to a new trial." *People v. Hari*, 218 Ill. 2d 275, 297 (2006), citing *People v. Jones*, 175 Ill. 2d 126, 134 (1997). There are facts, however slight, supporting defendant's withdrawal. In *Jones*, the court held that "[a]bsent defendant's tendered instruction, the jury lacked the necessary tools to analyze the evidence fully and to reach a verdict based on those facts. [Citation.] The resulting denial of due process requires that defendant be granted a new trial." *Jones*, 175 Ill. 2d at 134. The same is true here. Absent the withdrawal instruction, the jury lacked the tools to analyze all of the evidence to reach a verdict based on those facts, resulting in a denial of due process. *Hari*, 218 Ill. 2d at 296 ("This court has held that where there is some evidence to support an affirmative defense instruction, the trial court's refusal to instruct the jury constitutes an abuse of discretion even if the evidence is conflicting.") Accordingly defendant's conviction must be reversed and the cause remanded for a new trial. *Jones*, 175 Ill. 2d at 134.

¶ 44    Defendant also challenges the sufficiency of the evidence to sustain her guilt. Defendant argues the State's evidence did not establish that she solicited Carl's murder, that she was "involved in the actual planning of Carl's murder," or that defendant unlocked the back door and told the intruders where the guns were.

> "The double jeopardy clause will not prohibit the retrial of a defendant if
> an error in the proceedings caused the defendant's conviction to be set aside.
> [Citation.] The State may retry a defendant if a reviewing court determines that

the evidence presented at trial *** was sufficient to convict the defendant.

[Citation.] When considering the sufficiency of the evidence, we view the

evidence presented in the light most favorable to the State and determine whether

any rational trier of fact could have found the essential elements of the offense

proven beyond a reasonable doubt." *People v. Travis*, 2013 IL App (3d) 110170,

¶ 81.

Viewing the evidence in the light most favorable to the State, as we must, and so as to avoid

prejudicing either parties' case, we hold only that the evidence presented at trial was sufficient

for any rational trier of fact to find the essential elements of the charged offense proven beyond a

reasonable doubt.

¶ 45    Because the issue is likely to recur on remand, we will succinctly address defendant's

argument the trial court erred in conditioning an instruction on the lesser-included offense of

conspiracy on additional language on culpability for the acts of coconspirators in furtherance of

the conspiracy. Initially, the State argues that applying the "charging instrument approach" to

determining when a separate offense is a lesser-included offense of the charged offense,

conspiracy was not a lesser-included offense of murder in the case because, even though the

State admittedly prosecuted defendant under a theory of accountability, the indictment charged

defendant as a principal and "did not contain any reference to an 'agreement' that might describe

a conspiracy." Defendant argues an agreement can be reasonably inferred from the charges in

the indictment because, "although [the] murder charge alleged that [defendant] personally shot

Carl, the State's theory did not assert that she personally shot Carl; instead, the State's theory

was that she was accountable for the acts of the men who shot and killed Carl." Defendant relies

upon more recent decisions from our supreme court which she asserts hold that an uncharged

offense is a lesser-included offense of a charged offense "when the facts alleged in the charging instrument contain a broad foundation or main outline of the lesser offense."

¶ 46    The indictment against defendant reads as follows:

"Jacquelyn Greco also known as Jacquelyn Gaimari committed the offense of MURDER in that SHE, WITHOUT LAWFUL JUSTIFICATION INTENTIONALLY AND KNOWING [*sic*] SHOT AND KILLED CARL GAIMARI WITH A GUN, IN VIOLATION OF CHAPTER 38, SECTION 9-1-A(1), OF THE ILLINOIS REVISED STATUTES 1979 AS AMENDED, AND contrary to the Statute and against the peace and dignity of the same People of the State of Illinois.  COUNT NUMBER 1.

Jacquelyn Greco also known as Jacquelyn Gaimari committed the offense of MURDER in that SHE, WITHOUT LAWFUL JUSTIFICATION SHOT AND KILLED CARL GAIMARI WITH A GUN, KNOWING THAT SUCH SHOOTING WITH A GUN CREATED A STRONG PROBABILITY OF DEATH OR GREAT BODILY HARM TO CARL GAIMARI, IN VIOLATION OF CHAPTER 38, SECTION 9-1-A(2), OF THE ILLINOIS REVISED STATUTES 1979 AS AMENDED, AND contrary to the Statute and against the peace and dignity of the same People of the State of Illinois.  COUNT NUMBER 2.

Jacquelyn Greco also known as Jacquelyn Gaimari committed the offense of MURDER in that SHE, WITHOUT LAWFUL JUSTIFICATION WHILE COMMITTING A FORCIBLE FELONY, TO WIT: BURGLARY, SHOT AND KILLED CARL GAIMARI WITH A GUN, IN VIOLATION OF CHAPTER 38,

SECTION 9-1(A)(3), OF THE ILLINOIS REVISED STATUTES 1979 AS

AMENDED, AND contrary to the Statute and against the peace and dignity of the

same People of the State of Illinois.  COUNT NUMBER 3.

Jacquelyn Greco also known as Jacquelyn Gaimari committed the offense

of MURDER in that SHE, WITHOUT LAWFUL JUSTIFICATION WHILE

COMMITTING A FORCIBLE FELONY, TO WIT: ARMED ROBBERY, SHOT

AND KILLED CARL GAIMARI WITH A GUN, IN VIOLATION OF

CHAPTER 38, SECTION 9-1(A)(3), OF THE ILLINOIS REVISED STATUTES

1979 AS AMENDED, AND contrary to the Statute and against the peace and

dignity of the same People of the State of Illinois.  COUNT NUMBER 4.

Jacquelyn Greco also known as Jacquelyn Gaimari committed the offense

of MURDER in that SHE, WITHOUT LAWFUL JUSTIFICATION WHILE

COMMITTING A FORCIBLE FELONY, TO WIT: ROBBERY, SHOT AND

KILLED CARL GAIMARI WITH A GUN, IN VIOLATION OF CHAPTER 38,

SECTION 9-1(A)(3), OF THE ILLINOIS REVISED STATUTES 1979 AS

AMENDED, AND contrary to the Statute and against the peace and dignity of the

same People of the State of Illinois.  COUNT NUMBER 5."

¶ 47    The State does not dispute that its actual theory of defendant's guilt at trial was only that

she was legally accountable for the acts of others.  Nonetheless, the State relies on the bare

language of the charging instrument for its argument that conspiracy was not a lesser-included

offense of the charged murder under the "charging instrument approach."  In *People v. Ceja*, 204

Ill. 2d 332, 359 (2003), the defendant argued "where the State relies on evidence of the

defendant's 'agreement' to aid in the planning or commission of the offense to establish guilt of

murder-by-accountability, the defense should be able to rely on the same evidence to argue that the defendant merely 'agreed' that the offense should be committed by others, and is therefore guilty only of conspiracy to commit murder." *Ceja*, 204 Ill. 2d at 359. The trial court in that case found "that conspiracy to commit first degree murder was not available as an included offense because the indictment did not contain any allegation that defendant agreed with another in the planning or commission of the murders." *Id.* Our supreme court agreed and held the trial court did not err in refusing the defendant's tendered conspiracy instruction. *Id.* at 359, 362. The court explained that the charging instrument approach "is two tiered." *Id.* at 360. The first inquiry is whether the charging instrument itself "describes the lesser offense. At minimum, the instrument charging the greater offense must contain a broad foundation or main outline of the lesser offense." *Id.* The second inquiry is whether the evidence adduced at trial rationally supports a conviction on the lesser-included offense." *Id.* These are separate inquiries. *Id.*, citing *People v. Baldwin*, 199 Ill. 2d 1, 11 (2002).

> "As this court in *Baldwin* explained:
>
>> 'First, is the convicted offense indeed a lesser-included offense at all? To answer that question, we must examine the charging instrument and determine whether it sets forth a broad foundation or main outline of the lesser-included offense. Second, was it proper to find defendant guilty of this lesser-included offense? To answer that question, we must examine the evidence adduced at trial and determine whether it rationally supports a guilty finding. We cannot reach the second question without an affirmative answer to the first question.' (Emphases in original.)
>> *Baldwin*, 199 Ill. 2d at 14-15." *Id.* at 360-61.

In *Ceja*, because "the charging instrument did not contain any reference to an 'agreement' that might describe the offense of conspiracy" the court's inquiry ended; meaning that in *Ceja*, conspiracy was not "a lesser-included offense [of murder] at all." *Id.* at 361, quoting *Baldwin*, 199 Ill. 2d at 14-15.

¶ 48     In *People v. Kennebrew*, 2013 IL 113998, our supreme court reiterated that "decisions by this court make it clear that the charging instrument approach is the proper approach when determining whether an uncharged offense is a lesser-included offense of a charged offense." *Kennebrew*, 2013 IL 113998, ¶ 41.  However, the court also noted that

> "[i]n [*People v.*] *Kolton*, [219 Ill. 2d 353 (2006),] we held that 'the absence of a statutory element will not prevent us from finding that a charging instrument's description contains a "broad foundation" or "main outline" of the lesser offense.' [Citation.]  Instead, this court held that 'under the charging instrument approach, an offense may be deemed a lesser-included offense even though every element of the lesser offense is not explicitly contained in the indictment, as long as the missing element can be reasonably inferred.'  [Citation.]  In sum, an offense is a lesser-included offense under the charging instrument approach if every element of the uncharged offense is contained in the indictment or if any element not listed in the indictment can be reasonably inferred from the indictment allegations."
>
> *Kennebrew*, 2013 IL 113998, ¶ 34.

¶ 49     *Kennebrew* does not provide express guidance as to how to determine whether "any element not listed in the indictment can be reasonably inferred from the indictment allegations." In that case, the court simply held, without explanation, that "[b]ecause sexual penetration was alleged, we can infer that the act was done with the purpose of sexual gratification or arousal."

*Id.* ¶ 37 (discussing whether aggravated criminal sexual abuse was a lesser-included offense of aggravated criminal sexual assault). The *Kennebrew* court did note its earlier holding in *Kolton*, 219 Ill. 2d 353, in which the court held that it is "reasonable to infer the statutory element 'for the purpose of sexual gratification or arousal' primarily because 'sexual penetration' was alleged in [the] defendant's indictment and the type of conduct described in the definition of 'sexual penetration' is inherently sexual in nature and permits such an inference to be drawn." *Kolton*, 219 Ill. 2d at 369. See also *Kennebrew*, 2013 IL 113998, ¶ 36, citing *Kolton*, 219 Ill. 2d at 369.

¶ 50    In this case, defendant argues a conspiracy can be reasonably inferred because "though the indictment did not allege that [defendant] acted with another, if she did not act as the principal, then she must have aided another to do so—the very definition of accountability." However, the indictment in this case alleged that defendant shot and killed her husband Carl even though the only evidence was that defendant did not personally shoot her husband but rather was accountable for the acts of others who shot Carl. As defendant cites in her reply, our supreme court has stated in this context that this pleading practice is not inappropriate. In *Ceja*, cited in defendant's reply, our supreme court found:

> "It is proper to charge a defendant as a principal even though the proof is that the defendant was only an accomplice. [Citations.] Courts permit this pleading practice because accountability is not a separate offense, but merely an alternative manner of proving a defendant guilty of the substantive offense. [Citations.] A defendant charged as a principal can be convicted on a theory of accountability if supported by the evidence." *Ceja*, 204 Ill. 2d at 361.

Although this permits the prosecutor to effectively preclude the giving of an arguably lesser-included offense by carefully drafting the charging instrument to avoid it, our supreme court has

found this acceptable because " 'the State's Attorney is vested with exclusive discretion in the initiation and management of a criminal prosecution. That discretion includes the choice of which charges shall be brought. A criminal does not have the right to choose his or her prosecution or punishment.' [Citations.]" *People v. Davis*, 213 Ill. 2d 459, 478-79 (2004), citing *Ceja*, 204 Ill. 2d at 362 (rejecting the defendant's argument "that it is unfair to allow the prosecution to control the availability of lesser-included offense instructions through the language of the charging instrument"), *Novak*, 163 Ill. 2d at 205. Thus, "while a defendant may assert theories to try to mitigate or rebut responsibility for charged offenses, the defendant cannot argue responsibility for less serious, but unrelated, offenses which were not charged." *Davis*, 213 Ill. 2d at 478. "[T]he overriding constitutional concern when determining whether an offense is lesser-included is the sufficiency of the notice to the defendant." *Kolton*, 219 Ill. 2d at 371.

¶ 51    It is clear from the authorities cited that for the first step in the charging instrument approach this court must look first to the bare language of the charging instrument and no more to determine whether it contains "a 'broad foundation' or 'main outline' of the lesser offense" or, if an "element of the lesser offense is not explicitly contained in the indictment," that "missing element can be reasonably inferred." *Kennebrew*, 2013 IL 113998, ¶¶ 30, 34. Defendant has pointed only to the State's theory at trial, not anything in the charging instrument itself, to support her argument that an agreement with others to kill Carl can be inferred in this case. In this case, as in *Ceja*, "although the State prosecuted defendant under a theory of accountability, the indictment charged [her] as a principal. Thus, the charging instrument did not contain any reference to an 'agreement' that might describe the offense of conspiracy. This ends [the] inquiry." *Ceja*, 204 Ill. 2d at 361. Accordingly, we hold that upon retrial, if the retrial on the

current indictment, the trial court may not instruct the jury on the offense of conspiracy because that offense is not a lesser-included offense of the charged offense in this case "at all." See *Ceja*, 204 Ill. 2d at 361, quoting *Baldwin*, 199 Ill. 2d at 14-15.

¶ 52    Therefore, we have no reason to and thus decline to address the argument the trial court erred in conditioning the proffered lesser-included offense instruction on the inclusion of accountability language pursuant to *Pinkerton*. *People v. Ringland*, 2017 IL 119484, ¶ 35 ("Generally, a court of review will not consider an issue where it is not essential to the disposition of the case or where the result will not be affected regardless of how the issue is decided; nor will a reviewing court decide abstract questions or render advisory opinions."), *People v. Dunmore*, 2013 IL App (1st) 121170, ¶ 12 ("we will not decide abstract questions or render advisory opinions"). Similarly, we have no need to and thus decline to address defendant's arguments she received ineffective assistance of counsel. Such matters can be raised if they are repeated upon retrial of this matter; as may any concerns regarding the propriety of the State's arguments upon retrial, if they are repeated. However, we do note that in multiple instances the trial court sustained defendant's objections to the State's arguments or instructed the jury that it alone had the final determination of what the reasonable inferences and evidence are only for the prosecutor to persist in pressing her view of the evidence and attacks against defendant. We caution the State that "[a] prosecutor cannot use closing argument simply to 'inflame the passions or develop the prejudices of the jury without throwing any light upon the issues,' " and that "the salutary effect of sustaining an objection is eliminated where a prosecutor persists in continuing [an] improper argument." *People v. Wheeler*, 226 Ill. 2d 92, 128-30 (2007). Thus, when the court sustains an objection to arguments that have that effect, the prosecutor should not "continue the same line of argument." *Id.*

¶ 53                                                  CONCLUSION

¶ 54     For the foregoing reasons, the circuit court of Cook County is reversed, and the cause is

remanded for a new trial not inconsistent with this order.

¶ 55     Reversed and remanded.